# United States Court of Appeals
## For the First Circuit

No. 10-2315

UNITED STATES OF AMERICA,

Appellee,

v.

VIGGENS GUERRIER,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Stephen J. McAuliffe, U.S. District Judge]

Before

Lynch, Chief Judge,
Torruella and Thompson, Circuit Judges.

Leslie W. O'Brien for appellant.
Seth R. Aframe, Assistant United States Attorney, with whom
John P. Kacavas, United States Attorney, was on brief, for
appellee.

December 22, 2011

**THOMPSON**, <u>Circuit Judge</u>.

## Preface

Around midnight on a January evening in 2009, Viggens Guerrier and Christian German ducked into a crack house at 371 Manchester Street in Manchester, New Hampshire, looking for Dwight Bennett, a drug dealer who made a living taking crack from New York to New Hampshire for sale there.[1] They found him, and an irate German then robbed him of $1,500 and 10 grams of crack at gunpoint while Guerrier stood guard at the crack-house door. The backstory behind this – the "CliffsNotes" version, at least – is easily told. German was himself a drug dealer of some notoriety, and he and his drug-pushing partner, Jay Galeano, had agreed to let Bennett sell crack out of that house to their clients, provided they got a piece of the action.[2] But Bennett did not pay up, which is why German grabbed his old friend Guerrier (for extra muscle, just in case) and strode into the crack house that fateful night, with a gun at the ready.

Law enforcement later collared the duo, and, with German's help, a jury convicted Guerrier of conspiring to violate the Hobbs Act (sometimes called the "Act," for easy reading) – a

---

[1] We narrate the trial evidence in the light most flattering to the prosecution's theory of the case, <u>see</u>, <u>e.g.</u>, <u>United States v. Manor</u>, 633 F.3d 11, 12, 13-14 (1st Cir. 2011), skipping over nonessentials.

[2] Jay Galeano's name is spelled several ways in the record, so we use the spelling that the parties use in their briefs.

statute that (among other things) makes a federal crime out of robbery or conspiracy to rob that "in any way or degree obstructs, delays, or affects" interstate or international commerce. See 18 U.S.C. § 1951(a)-(b). Guerrier now appeals his conviction (but not his sentence of 6½ years in prison plus 3 years of supervised release), raising four issues, none of which requires reversal.

## Sufficiency of the Indictment

Citing Federal Rule of Criminal Procedure 12(b), Guerrier moved pretrial to dismiss the indictment. Prosecutors had produced no evidence during discovery that his acts had affected interstate commerce, leaving them unable to satisfy the Act's jurisdictional prerequisite – or so he claimed. The district judge made quick work of Guerrier's motion, denying it in a margin order. And our de novo review of this legal issue, see, e.g., United States v. Lopez-Lopez, 282 F.3d 1, 9 (1st Cir. 2002), convinces us that the judge got the matter exactly right.

When grading an indictment's sufficiency, we look to see whether the document sketches out the elements of the crime and the nature of the charge so that the defendant can prepare a defense and plead double jeopardy in any future prosecution for the same offense. See, e.g., United States v. Eirby, 262 F.3d 31, 37-38 (1st Cir. 2001). Guerrier does not suggest that his indictment flunks this test. And his attempt to sink a facially valid

indictment with a motion to dismiss that targets the strength of the government's <u>evidence</u> misfires.

What counts in situations like this are the charging paper's <u>allegations</u>, which we must assume are true. <u>See</u>, <u>e.g.</u>, <u>United States</u> v. <u>Bohai Trading Co.</u>, 45 F.3d 577, 578 n.1 (1st Cir. 1995). Consistent with that rule, courts routinely rebuff efforts to use a motion to dismiss as a way to test the sufficiency of the evidence behind an indictment's allegations, <u>see</u>, <u>e.g.</u>, <u>United States</u> v. <u>Moore</u>, 563 F.3d 583, 586 (7th Cir. 2009); <u>United States</u> v. <u>Todd</u>, 446 F.3d 1062, 1067 (10th Cir. 2006); <u>United States</u> v. <u>Salman</u>, 378 F.3d 1266, 1268 (11th Cir. 2004) (per curiam); <u>United States</u> v. <u>De Laurentis</u>, 230 F.3d 659, 660 (3d Cir. 2000); <u>United States</u> v. <u>Jensen</u>, 93 F.3d 667, 669 (9th Cir. 1996); <u>United States</u> v. <u>Mann</u>, 517 F.2d 259, 267 (5th Cir. 1975) – even when the challenge centers on the adequacy of the evidence concerning the interstate-commerce aspects of a Hobbs-Act offense, <u>see</u> <u>United States</u> v. <u>Alfonso</u>, 143 F.3d 772, 776-77 (2d Cir. 1998) (stressing that unless prosecutors have "made what can fairly be described as a full proffer of the evidence [they] intend[] to present at trial to satisfy the jurisdictional element of the offense, the sufficiency of the evidence is not appropriately addressed on a pretrial motion to dismiss an indictment").[3] Ultimately, we can do

---

[3] <u>See</u> <u>generally</u> <u>United States</u> v. <u>Sampson</u>, 371 U.S. 75, 78-79 (1962) (deeming it unimportant that none of the charges had been "established by evidence" at the motion-to-dismiss stage, because

-4-

no better than repeat what the Supreme Court said in a related context over 55 years ago:  in the ordinary course of events, a technically sufficient indictment handed down by a duly empaneled grand jury "is enough to call for trial of the charge on the merits."  Costello v. United States, 350 U.S. 359, 363 (1956) (explaining that the Fifth Amendment's grand-jury guarantee does not give defendants the right to a "preliminary trial to determine the competency and adequacy of the evidence" undergirding the indictment).  Tellingly, Guerrier cites no cases supporting his position, and, unsurprisingly, we know of none either.  The net result is that the judge correctly denied Guerrier's motion to dismiss the indictment.

## Un-Mirandized Statements

Guerrier also moved pretrial to suppress prearrest statements made during an interview with his parole officer and two law-enforcement agents.  His argument was a simple one:  under the totality of the circumstances, they had had him "in custody" and therefore should have advised him of his Miranda rights before they began asking questions.  Miranda v. Arizona, 384 U.S. 436, 478-79 (1966).  Guerrier did not testify at the suppression hearing.  But the parole and law-enforcement officers did, and this is what they say happened, as credited by the judge (and he committed no clear

"the indictment must be tested by its sufficiency to charge an offense").

-5-

error in doing that, see, e.g., United States v. Hughes, 640 F.3d 428, 434 (1st Cir. 2011)):

Looking into the Bennett robbery, officers heard that German and Guerrier had probably done it. German was no stranger to police. They had pegged him as the chief culprit in a slew of other drug-dealer robberies, and they wanted Guerrier to help nail him. Having learned that Guerrier was on parole from a prior drug-related offense, FBI Special Agent Michael Schneider asked Guerrier's parole officer, Marc O'Donoghue, to help set up an interview. And O'Donoghue did what he could.

At Guerrier's next regularly-scheduled parole meeting, Schneider and a colleague, Manchester Detective Steven Coco, showed up – dressed in plain clothes with their weapons concealed – and camped outside O'Donoghue's office while O'Donoghue told Guerrier that some men wanted to see him. O'Donoghue then walked Guerrier over to Schneider and Coco, who introduced themselves as law-enforcement agents. Schneider calmly told Guerrier that they wanted to speak with him about a matter unrelated to his parole status, that he was not under arrest, and that he did not have to talk to them if he did not want to. But if he was game, Schneider added, they could chat over a cup of coffee in a more relaxed setting. Guerrier said okay, or something to that effect.

The foursome – Schneider, Coco, O'Donoghue, and Guerrier – got into Schneider's unmarked Ford Explorer. Schneider drove,

Coco rode in the front passenger seat, and Guerrier and O'Donoghue sat in back. Keeping the doors unlocked, Schneider cruised to a Dunkin Donuts, about five minutes away from O'Donoghue's office. He bought Guerrier a hot chocolate at the drive-thru and then parked in a nearby strip-mall parking lot. Other people were milling about there.

Turning to Guerrier, Schneider thanked him for taking the time out of his day to tag along with them and, in a low-key way, said that they hoped he could help them with the Bennett robbery. But Schneider stressed to him that he did not have to say anything to them if he did not feel like it, that he was not under arrest, and that they would drive him wherever he wanted if he wanted out. Guerrier piped in, saying that German had asked for his help in collecting some money, that he had driven him to 371 Manchester Street, and that he had seen him take Bennett into a bedroom. But he adamantly insisted that he knew nothing about a robbery.

That did not go over well with Schneider, because some of what Guerrier said clashed with what law enforcement knew. Schneider was "frustrated," though he stayed calm as he laid out for Guerrier the evidence against him. Actually, neither Schneider nor the others ever yelled at Guerrier or threatened to arrest him. Also, Guerrier never looked nervous or scared, and he never asked to stop the interview, which lasted 20 to 25 minutes.

Once Schneider realized that he was not getting anywhere with Guerrier, he offered to drop Guerrier off at a place of his (Guerrier's) choosing. O'Donoghue then spoke up, saying that he still had to conduct his previously-scheduled meeting with Guerrier, so Schneider drove them back to O'Donoghue's office. When their meeting ended, O'Donoghue arrested Guerrier for failing a drug test two months earlier and for visiting 371 Manchester Street, a well-known crack house. That was the first Guerrier had heard about the failed drug test. And neither Schneider nor Coco knew that O'Donoghue was going to arrest Guerrier.

Everyone pretty much knows that the Miranda rule tells police not to question a suspect in custody unless they first advise him of his right to remain silent, among other things. Miranda, 384 U.S. at 478-79; accord Stansbury v. California, 511 U.S. 318, 322 (1994) (per curium). Following the evidentiary hearing, the judge here concluded that Miranda was not in play because the complained-of interview was not custodial and Guerrier's statements "were completely voluntary," so he orally denied the motion. Guerrier takes issue with this ruling. As always, we review the judge's factfinding under the deferential clear-error standard (as we mentioned above), but we give a fresh look to how he applied the law to the facts. See, e.g., Hughes, 640 F.3d at 434. When all is said and done, we see no error.

-8-

A person need not be under arrest for Miranda rights to arise. Id. at 435. But he must be in "custody," because precustodial questioning does not require Miranda warnings. Id. Normally an inquiring court uses a two-part test to see if a person is in custody for Miranda purposes: first the court examines the circumstances surrounding the questioning and then it sees whether those circumstances would cause a reasonable person to have understood his situation to be comparable to a formal arrest. See, e.g., Thompson v. Keohane, 516 U.S. 99, 112 (1995); Hughes, 640 F.3d at 435; United States v. Ellison, 632 F.3d 727, 729 (1st Cir. 2010). Several factors guide this analysis, including "(without limitation) where the questioning occurred, the number of officers, the degree of physical restraint, and the duration and character of the interrogation." United States v. Teemer, 394 F.3d 59, 66 (1st Cir. 2005).

Measured against these legal markers, the complained-of encounter did not rise to the level of a custodial interrogation. True, officers questioned Guerrier in an unmarked auto. But that fact does not by itself implicate Miranda, given that a prearrest interview "at a police station is not automatically deemed custodial." Teemer, 394 F.3d at 66 (citing California v. Beheler, 463 U.S. 1121, 1125 (1983) (per curiam)). Focusing on the atmospherics, then, we see a relatively calm and nonthreatening prearrest interaction. Schneider politely told Guerrier more than

-9-

once that he was not under arrest, that he need not answer any questions, and that he could come or go as he pleased. See, e.g., United States v. McCarty, 475 F.3d 39, 46 (1st Cir. 2007) (stressing that details like these support a no-custody finding); Ellison, 632 F.3d at 730 (similar). And Guerrier expressed no qualms about talking with them. Schneider also parked the auto in a busy public lot and left the doors unlocked. See, e.g., United States v. Jones, 187 F.3d 210, 218 (1st Cir. 1999) (finding no custody in part because the interview occurred on a "public highway," which is "a neutral setting that police officers are not in a position to dominate as they are, for example, an interrogation room at a jailhouse"). He and the others wore plain clothes and kept their weapons hidden. See, e.g., Hughes, 640 F.3d at 436 (finding no custody in a factually similar situation). No one screamed at Guerrier, badgered him for answers, or menaced him in any way. See, e.g., id. at 437 (highlighting caselaw finding no custody where officers acted in a similarly nonthreatening way). And the interview lasted a relatively short time too, roughly 20-25 minutes. See, e.g., id. (ruling that an interview lasting 90 minutes was not custodial); United States v. Nishnianidze, 342 F.3d 6, 14 (1st Cir. 2003) (holding that a 45-minute interview did not implicate Miranda). All of this supports the judge's ruling that the interview was noncustodial. See, e.g., Hughes, 640 F.3d at 436-37; Ellison, 632 F.3d at 730. That one parole and two law-

enforcement officers were present during the questioning does not tip the custody balance in Guerrier's favor either. See, e.g., Hughes, 640 F.3d at 436.

Despite not testifying at the suppression hearing, Guerrier argues on appeal that because he knew that he had taken drugs and a drug test before running into Schneider and the others at O'Donoghue's office, "he must have known" before Schneider kicked off the interview that he had flunked that test and that his next stop was jail anyway – so, he says, a reasonable person would not have felt free to leave, which means that he was in custody under Miranda. While it is debatable whether Guerrier did enough to preserve this issue below, we assume (without deciding) that he did, as his theory fails for another reason:  it is nothing more than speculation, pure and simple, given that none of the suppression-hearing evidence suggests that he had to have known about the failed drug test before the encounter. Actually, it is worse than speculation, because his hypothesis is contradicted by the record.  The suppression-hearing evidence shows, for example, that Guerrier learned about the failed test after Schneider and Coco had left.  It also shows that during the interview Guerrier did not act like he expected officers to slap the cuffs on him any second.  And this record evidence trumps his surmise.

To wrap up, we conclude that, given the totality of the circumstances, a reasonable person in Guerrier's shoes would not

have believed that he was under arrest.  Consequently, the judge's ruling that no <u>Miranda</u> warnings were required at that time stands.

## Sufficiency of the Trial Evidence

Guerrier contests the sufficiency of the evidence against him, claiming that the government did not show that the German/Guerrier conspiracy to rob Bennett affected interstate commerce.  But Guerrier must convince us that even after "crediting the government's witnesses and drawing all reasonable inferences in its favor," no levelheaded jury could have found him guilty. <u>United States</u> v. <u>Aranjo</u>, 603 F.3d 112, 116 (1st Cir. 2010).  Also, that he can float "a plausible theory of innocence" does not matter:  if the evidence (direct and circumstantial), viewed most favorably to the verdict, establishes the essential elements of the crime beyond a reasonable doubt, it need not cancel out every theory consistent with his innocence.  <u>Manor</u>, 633 F.3d at 14; <u>see also</u> <u>United States</u> v. <u>Echeverri</u>, 982 F.2d 675, 677 (1st Cir. 1993) (stressing that a court "need not believe that no verdict other than a guilty verdict could sensibly be reached, but must only satisfy itself that the guilty verdict finds support 'in a plausible rendition of the record'") (quoting <u>United States</u> v. <u>Ortiz</u>, 966 F.2d 707, 711 (1st Cir. 1992)).  A winning sufficiency challenge is a rare thing indeed.  <u>See</u>, <u>e.g.</u>, <u>Manor</u>, 633 F.3d at 15 (citing <u>United States</u> v. <u>Ortiz</u>, 447 F.3d 28, 32 (1st Cir. 2006)).

And after our de novo review, see, e.g., id. at 13, we conclude that Guerrier's bid comes up short.

Proving an effect on interstate commerce is not too difficult under controlling, long-existing precedent. See, e.g., United States v. Capozzi, 486 F.3d 711, 726 (1st Cir. 2007) (calling the government's burden "'not onerous'") (quoting United States v. DiGregorio, 605 F.2d 1184, 1191 (1st Cir. 1979)). Even in a prosecution for disrupting illegal commerce, the government need not show a substantial interference – a de minimis one will do.[4] See, e.g., United States v. DeCologero, 530 F.3d 36, 68 (1st Cir. 2008). Certainty of a de minimis effect is not required either. A "realistic probability" suffices. See United States v. Butt, 955 F.2d 77, 80 n.2 (1st Cir. 1992). And "[e]ven potential future effects" may be enough. Capozzi, 486 F.3d at 726. When it comes down to it, "little is needed" to cross this "very low" threshold. United States v. Murphy, 193 F.3d 1, 10 (1st Cir. 1999).

Drug dealing typically is an enterprise that affects interstate commerce, and dealer-on-dealer robbery can satisfy the affecting-commerce element of the Hobbs Act by (for example) depleting the victim-dealer's business assets. See, e.g., DeCologero, 530 F.3d at 68; Capozzi, 486 F.3d at 726. Also, the

---

[4] "De minimis" is legalese for "trifling" or "minimal." Black's Law Dictionary 496 (9th ed. 2009).

Act can cover "the use of force and threats to resolve a contractual dispute among businessmen." United States v. Porcaro, 648 F.2d 753, 760 (1st Cir. 1981).

Hoping to convince us that his case does not come within the Act's reach, Guerrier argues like this: Because German and Bennett were members of the same drug-dealing business (the 371 Manchester Street crack house) that serviced the same clientele, the robbery simply shifted assets (money and drugs) from one member (Bennett) to another (German). And because the assets stayed within the same business, the robbery did not deplete the business's assets, meaning no rational jury could find that the German/Guerrier conspiracy affected interstate commerce, even minimally. Guerrier's theory is certainly interesting. But his reading of the record does not square with our standard of review, which is heavily stacked against him – again, we must peruse the record from the prosecution's perspective, making all inferences and credibility choices in its favor. See, e.g., United States v. Polanco, 634 F.3d 39, 45 (1st Cir. 2011). And that makes all the difference.

What the jury learned was that German had only one partner in this drug-pushing venture – and Galeano was the guy, not Bennett. The two (German and Galeano) split all profits 50/50. Galeano knew Bennett from their time spent together in prison. Having dealt drugs in New York, Bennett decided to deal in New

-14-

Hampshire because he thought he could earn greater profits there (crack is harder to come by in New Hampshire, apparently, so Bennett could take crack from New York and charge a higher price to customers in the Granite State). Bennett wanted to stay at 371 Manchester Street, the crack house that German and Galeano ran. German said no at first. But Galeano explained that Bennett was coming to New Hampshire to peddle drugs regardless, so German decided to "make some money" off him. A deal was struck: Bennett could live at the crack house and start selling his New York crack to German and Galeano's New Hampshire customers (as a newcomer to the scene, Bennett had no existing client base there), provided he gave German and Bennett part of his profits and some of his supply. Discussing the dynamics of their relationship, German called Bennett simply one of his suppliers.

The record does not say what cut of his profits Bennett had to hand over to German and Galeano. But a jury could infer that he was still left with enough money to make the whole arrangement worth his while – money that he could use to buy more crack during his biweekly drug-buying treks to New York. And a jury could also infer that Bennett would have headed to New York soon had German and Guerrier not paid him that late-night visit to avenge his breaching the agreement with German and Galeano – a visit that left him with less cash to buy crack.

Viewing the record in the light most favorable to the verdict, we think that a clear-sighted jury could find several things. First, there was a German/Galeano drug-dealing business – not a German/Bennett one. Second, Bennett ran his own New Hampshire drug-dealing venture, fueled by a New York supply. Third, he had contracted with German and Galeano so that he could find a footing in the New Hampshire market. And fourth, he did not live up to his commitments, which led to the robbery, which in turn gummed up his drug-buying operation. From all this, a rational jury could find that the German/Guerrier conspiracy had a realistic probability of affecting interstate commerce to some minimal degree, either because it worked to settle a business squabble among persons engaged in interstate commerce, see, e.g., Porcaro, 648 F.2d at 760, or depleted the assets of Bennett's interstate enterprise, see, e.g., DeCologero, 530 F.3d at 68; Capozzi, 486 F.3d at 726, or both. A reasonable jury, in short, had sufficient bases to convict Guerrier under the Hobbs Act.

**Ineffectiveness of Counsel**

As a last stand, Guerrier challenges his conviction on ineffective-assistance grounds, arguing that his trial counsel botched his case by not moving to dismiss the indictment after the government (supposedly) flouted his rights under the Interstate Agreement on Detainers Act (the "IADA," for short). See 18 U.S.C. App. 2 § 2. Prosecutors had him shipped from state custody (where

-16-

he was following his parole-violation arrest) to federal custody for arraignment on the federal indictment, and then back again, he says. And that, he protests, infracted the IADA's anti-shuttling provision, which "ensures that, once the receiving government obtains custody of the prisoner, it will try him before returning him to the sending government's stewardship." United States v. Hunnewell, 891 F.2d 955, 958 (1st Cir. 1989).

Subpar performance and prejudice are the two essentials for a winning ineffective-assistance claim. See, e.g., Strickland v. Washington, 466 U.S. 668, 688, 691-92 (1984). A huge problem for Guerrier, though, is that we typically do not review a claim like that on direct appeal, requiring instead that a defendant raise it (if at all) in a separate collateral proceeding. See, e.g., United States v. Rivera-Gonzalez, 626 F.3d 639, 644 (1st Cir. 2010). An exception exists for the rare case where the record is sufficiently developed and the important facts are undisputed. See, e.g., United States v. Torres-Rosario, 447 F.3d 61, 64 (1st Cir. 2006). This is not that case, however. A big unknown on this record is how prosecutors got Guerrier to federal court. Did they use a writ of habeas corpus ad prosequendum (the "writ," for simplicity's sake) or an IADA detainer? We see a writ in the record, not a detainer. But the government argues, persuasively, that only a court on collateral review can give a definitive answer on this critical question – critical because Guerrier needs an IADA

detainer as a first step in showing an IADA violation.  See United States v. Casas, 425 F.3d 23, 67 (1st Cir. 2005).  Guerrier, notably, does not take issue with this argument.  The government also insists that the current record leaves a lot to the imagination on other issues (e.g., whether Guerrier's lawyer's alleged shortcomings caused prejudice) – uncertainties that can only be resolved through the habeas process, it quickly adds.  But what we have said already about the writ/IADA-detainer mystery is enough to reject Guerrier's ineffective-assistance claim as unripe.  See, e.g., Rivera-Gonzalez, 626 F.3d at 644-45; United States v. Moran, 393 F.3d 1, 10-11 (1st Cir. 2004); Hunnewell, 891 F.2d at 956.  If he wishes, he can pursue the matter by filing a petition with the district court under 28 U.S.C. § 2255.  See, e.g., Rivera-Gonzalez, 626 F.3d at 645; Moran, 393 F.3d at 16; Hunnewell, 891 F.2d at 956 n.1.  Obviously, we express no view on how a petition like that might fare.

## Conclusion

Our review over, we affirm Guerrier's conviction and dismiss his ineffective-assistance claim without prejudice.

**So ordered**.