# United States Court of Appeals
## For the First Circuit

No. 10-2372

UNITED STATES OF AMERICA,

Appellee,

v.

JAKE C. CROOKER,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Michael A. Ponsor, U.S. District Judge]

Before

Lynch, Chief Judge,
Stahl and Lipez, Circuit Judges.

Rebecca A. Jacobstein for appellant.

Kelly Begg Lawrence, Assistant United States Attorney, with whom Carmen M. Ortiz, United States Attorney, was on brief, for appellee.

July 27, 2012

**LIPEZ, <u>Circuit Judge</u>**.  Jake Crooker was charged with possession of firearms and ammunition by an unlawful user of a controlled substance, in violation of 18 U.S.C. § 922(g)(3), and possession of marijuana, in violation of 21 U.S.C. § 844.  After a jury trial, Crooker was convicted of possession of marijuana and fined $4000.  He now appeals the district court's denial of his motion to suppress statements and evidence recovered during the July 15, 2004, search of 62 Joseph Avenue in Westfield, Massachusetts, where he resided with his parents and brothers. Crooker argues that the search warrant was not supported by probable cause and was a defective general warrant that did not state with particularity the items to be seized.  Moreover, he alleges that the agents executing the warrant exceeded its scope. He also argues that the statements admitted against him were made during custodial interrogations without the benefit of <u>Miranda</u> warnings.  We affirm.

**I.**

When reviewing the denial of a motion to suppress, we rehearse the facts as supportably found by the court below, including any inferences drawn by the court from the discerned facts.  <u>United States</u> v. <u>Pontoo</u>, 666 F.3d 20, 24 (1st Cir. 2011). Here, we draw from the district court's bench decision, issued after a hearing on Crooker's motion to suppress, as well as the

-2-

affidavit supporting the search warrant and other hearing testimony.

## A. Factual Background

The relevant series of events was triggered by an ongoing Federal Bureau of Investigation ("FBI") investigation of Crooker's uncle, Michael Crooker.[1] The application and affidavit in support of a warrant to search the buildings and grounds of 62 Joseph Avenue, Crooker's residence, were submitted by FBI Special Agent Richard Winfield. The documents primarily described the FBI's evidence against Michael, who does not live at 62 Joseph Avenue. The evidence suggested that Michael was involved in the unlawful manufacture, storage, and interstate shipping of explosives, biological toxins, and weapons. Although Michael did not live at 62 Joseph Avenue, Winfield's affidavit stated that the FBI had reason to believe that Michael had buried ricin near a stump in his brother Stephen's (and Crooker's) backyard at 62 Joseph Avenue.[2] The warrant application included an attachment detailing the items the government sought to seize during the search, including specified firearms and evidence of explosives and biological

_____

[1] Because many of the parties share a last name, first names will be used. Any use of "Crooker" alone refers to Jake Crooker. Crooker's father is Stephen Crooker, and his uncles are Michael and Peter Crooker.

[2] Ricin is a deadly toxin derived from castor beans. A few grains, if injected, inhaled, or ingested, can kill an adult.

weapons violations, as well as evidence related to those violations stored on one or more computers.

On July 14, 2004, a warrant was issued to search the grounds and residence at 62 Joseph Avenue for

> evidence, fruits or instrumentalities of the manufacturing of explosive materials without a license, in violation of Title 18, United States Code, Section 842(a)(1); shipping, transporting or receiving any explosive materials in interstate commerce, in violation of Title 18, United States Code, Section 842(i); illegal storage of explosive materials, in violation of Title 18, United States Code, Section 842(j); and possession and manufacture of biological weapons in violation of Title 18, United States Code, Section 175.

The warrant did not incorporate the affidavit or the list of items to be seized. Thus, the warrant did not authorize seizure of firearms, ammunition, drugs, or drug paraphernalia. See Groh v. Ramirez, 540 U.S. 551, 557-58 (2004) (stating that a warrant authorizes only the seizure of items described with particularity on the face of the warrant or in documents explicitly incorporated in the warrant).

Agents from the FBI and the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") and local police executed the search warrant on the afternoon of July 15, 2004. A team of agents consisting of between four and eight men led by FBI Special Agent Mark Karangekis (the "entry team") entered and cleared the house. They were clad in black clothing and FBI attire and ran up the lawn

single file with their weapons drawn.  Karangekis knocked at the front screen door and announced the agents' purpose.  After Crooker exited the house and chained up one of his dogs at the agents' request, the entry team went into the house and began clearing it.[3] After the house had been cleared, the "search team" led by FBI Special Agent Robert Lewis entered the house.  Lewis was responsible for coordinating the search, taking custody of seized evidence at the conclusion of the search, and maintaining contact with the individuals whose house was being searched.

During the multiple hour search, Lewis and Springfield Police Officer Ronald Sheehan had a conversation with Crooker in front of the house.  At the beginning of the interaction, Sheehan frisked Crooker and seized a cigarette pack that held a bag containing a green leafy substance.[4]  The agents did not arrest Crooker or advise him of his <u>Miranda</u> rights, but instead asked him to consent to questioning.  The conversation began in the front yard and, due to the heat, at least some part of the conversation occurred in Lewis's air-conditioned car.  During the conversation, Crooker told the agents that there were four safes in the house -

---

[3] Karangekis testified that he entered before Crooker removed the dog and that the rest of the entry team came in after the dog was secured.  The discrepancy does not change our analysis.

[4] The parties disagree about the location on Crooker's person of the cigarette pack.  Lewis testified that he saw Sheehan take the pack from Crooker's hand.  Crooker testified that Sheehan took the pack out of his front left jeans pocket.

Crooker had access to two, which contained his and his mother's weapons, and his father had access to the other two, which contained antique firearms.[5] Lewis testified that he knew at the time of the search that the warrant did not authorize seizure of firearms or ammunition. Nevertheless, Lewis asked Crooker to open the two safes to which Crooker had access, and agents seized several weapons and ammunition from inside the safes. Lewis stated that he seized the weapons because he knew that: (1) Stephen Crooker's prior felony conviction made his possession of weapons and ammunition unlawful and he was unsure whether Stephen had access to the items, and (2) Crooker had confessed to using illegal drugs, making his possession of firearms unlawful.

Later in the search, ATF Special Agents Michael Curran and Debora Seifert interacted with Crooker, who was cooperative and again described the family members' varied access to the four safes. Crooker also mentioned that there was an unlocked tackle box containing ammunition that belonged to him in the living room.[6] When Curran asked Crooker if he used drugs, Crooker said that he occasionally used marijuana and that there was some marijuana inside the house that belonged to him. Agents then seized bags of

---

[5] Individuals previously convicted of felonies may lawfully possess "antique firearms" as defined in 18 U.S.C. § 921(a)(16).

[6] Crooker refers to the box as a tackle box, while the government calls it a toolbox. The distinction is not relevant, and we refer to it throughout as a tackle box.

what appeared to be marijuana from the kitchen and basement. The tackle box containing ammunition and a cigarette rolling device was seized, along with all of its contents. Curran and Seifert testified that, although they knew that Crooker had a valid state license to possess firearms, they considered him a user of illegal narcotics, and thus it was unlawful for him to possess the weapons and ammunition.

## B. Procedural History

After he was indicted, Crooker moved to suppress the statements he made during the search as well as various physical evidence seized that day. Crooker argued, among other things, that Winfield's affidavit failed to establish probable cause for the issuance of the warrant; the search exceeded the scope of the warrant; the plain view exception did not apply to seizure of various pieces of evidence; and he was subject to custodial interrogation without being advised of his Miranda rights. After the district court denied the motion to suppress, Crooker was tried for unlawful possession of marijuana and possession of firearms and ammunition while using illegal narcotics. The jury convicted Crooker on the marijuana charge and acquitted him of the firearm charge. The court imposed a $4000 fine. Crooker now appeals the district court's denial of his motion to suppress. In so doing, he both repeats grounds he argued below and challenges for the first time the particularity of the warrant. Although his particularity

claim is presented for the first time on appeal, he argues that the claim was forfeited - not waived - and thus is entitled to plain error review.

**II.**

**A.  Motion to Suppress Tangible Evidence**

In support of his appeal, Crooker argues that (1) the warrant was not properly supported by probable cause, (2) the agents executing the search exceeded the scope of the warrant, and (3) the warrant lacked the particularity required by the Fourth Amendment.  When reviewing a denial of a motion to suppress, we review the district court's factual findings for clear error, and its legal conclusions (for example, that a given set of facts constituted probable cause) de novo.  United States v. McMullin, 568 F.3d 1, 5 (1st Cir. 2009).  "A clear error exists only if, after considering all of the evidence, we are left with a definite and firm conviction that a mistake has been made," and "we will uphold a district court's decision to deny a suppression motion provided that any reasonable view of the evidence supports the decision."  Id. (quoting United States v. Woodbury, 511 F.3d 93, 96-97 (1st Cir. 2007)) (internal quotation marks omitted).

**1.  Probable Cause for the Issuance of the Warrant**

As he did below, Crooker argues that "[t]here was absolutely no probable cause to believe that evidence of a crime would be found in the residence at 62 Joseph Avenue," and that

there was no nexus between the residence and the crimes committed by his uncle Michael. As Crooker puts it, "[t]he only and tenuous link to 62 Joseph Avenue, that Michael Crooker hid a handful of ricin by a stump in the backyard, came from an untrustworthy jailhouse informant with prior convictions for fraud." Crooker argues that this information was insufficient to provide a reason to believe that there was contraband related to explosives or biological agents in his backyard. Moreover, he argues that even if there were reason to believe contraband might be found in the backyard, there was no reason to believe contraband would be found inside the house.

In response to the government's evidence, the district court concluded in a bench decision that the warrant was supported by probable cause. In so doing, the court relied on information in the Winfield affidavit, noting that it had been clearly shown that Michael was "involved in the production of explosives and very dangerous materials" and various evidence tied those materials to Crooker's house. For example, a prisoner at the Hampden County Correctional Facility ("CI-2")[7] told agents that Michael told him that a handful of ricin was buried near a tree stump in Crooker's yard.[8] The court noted that although CI-2's word alone would be

_____

[7] Our use of "CI-1" and "CI-2" corresponds with the parties' use of those labels in their briefs.

[8] Michael was arrested on June 23, 2004, pursuant to a warrant and imprisoned in the Hampden County Correctional Facility. On

-9-

unreliable, much of the information he provided was corroborated by Special Agent Winfield.[9] The district court also relied on a phone call between Stephen and Michael that was described in the Winfield affidavit.[10] During that call, Stephen and Michael discussed "R" and how to use Michael's "R" as a plea negotiating tool.[11] Agent Winfield believed "R" to be a reference to ricin. From this phone call, the court found that "it was clear that the two of them were speaking to some extent in code, which suggests that they had information that they did not want others to easily understand, and that the material was of sufficient importance and potency that it was a bargaining chip in the negotiations with the government." Moreover, according to a former friend of Michael's ("CI-1"), Michael had recently moved his poisons and explosives lab to Crooker's grandfather's house. Michael showed CI-1 the lab,

---

July 13, 2004, he was indicted for shipping a firearm in interstate commerce, in violation of 18 U.S.C. § 922(g).

[9] For example, Winfield verified the addresses and unlisted phone numbers that CI-2 said Michael had given him for Stephen and Peter Crooker, so that CI-2 could contact them on Michael's behalf when CI-2 was released from jail. CI-2 also stated that Michael told him he had access to a National Car Rental ("NCR") facility in Connecticut. According to Winfield, by mid-June 2004, Michael had stolen approximately 27 vehicles from NCR.

[10] This phone call was recorded by officials at the Hampden County Correctional Facility where Michael was being held at the time of the call.

[11] We do not know how Michael and Stephen thought that Michael might use the ricin as a plea negotiating tool. The Winfield affidavit does not elaborate, and the record does not contain the full content of the call between Michael and Stephen.

pointing out where he made and kept explosives. Michael also told CI-1 that he had buried a MAC 10 gun but could not find it and had buried various gun parts in ammunition cans. Michael did not specify to CI-1 where the MAC 10 or gun parts were buried. Also, according to CI-2, Michael hid ricin in two locations other than Stephen's backyard. Based on this evidence, the district court concluded that "it would have been irresponsible for the government not to make an effort to recover this very dangerous material from the location [in] which they had probable cause to believe they would find it."

We agree with the district court's analysis. The government had specific information from a confidential informant that ricin was buried in Crooker's backyard, and that Michael hid various weapons and biological agents in numerous locations and moved those items around to avoid detection. This information was the backdrop for additional information that the government had from recorded phone conversations between Michael and Stephen, notably Michael and Stephen's discussion in coded language about ricin and its value in Michael's plea negotiations with the government. In another discussion, Stephen and Michael referred to unidentified property belonging to Michael, noting that Crooker's grandfather had moved it to an undisclosed location. This information was supplemented by information from a confidential informant, who stated that Michael kept his explosives lab

equipment and supplies as well as ammunition in Crooker's grandfather's basement and shed. In light of Stephen and Michael's secretive conversations about the biological toxin ricin, their discussion about moving Michael's possessions while Michael was incarcerated, and information provided by confidential informants - including information that Michael had buried ricin in Crooker's backyard, there was probable cause to believe that evidence of the enumerated crimes would be found at Crooker's house. Accordingly, the district court did not err in denying Crooker's motion to suppress on probable cause grounds.

## 2. Scope of the Search

Crooker alleges that the seized tackle box, on which marijuana residue was found, and its contents, including the seized ammunition and cigarette rolling device, should have been suppressed.[12] He argues that the seizure of the tackle box and its contents was beyond the scope of the warrant because the warrant only authorized the seizure of evidence related to explosives and biological weapons. The warrant did not incorporate the list of items to be seized submitted with the affidavit. Thus, Crooker argues, any seizure of drugs or drug paraphernalia was unlawful.

---

[12] In his motion to suppress, Crooker also argued that the seized guns should be suppressed because their recovery was beyond the scope of the warrant. Crooker's claims with respect to the guns and ammunition are moot on appeal. Crooker was acquitted of the weapons charge at trial.

In the alternative, Crooker argues that, even if some contents of the tackle box could have been seized under the plain view exception to the warrant requirement, the agents were required to separate out the items with immediately apparent evidentiary value and leave behind those items that were not immediately identifiable as contraband or evidence of a crime. Specifically, he argues that the agents should have removed the loose ammunition and rolling device from the tackle box and left the box and the remainder of its contents in the house.

The district court concluded that the search and seizure of the tackle box did not exceed the scope of the warrant. Because the warrant authorized the agents to search for evidence of biological weapons, including small amounts of ricin powder, the agents could legitimately open every container in the house to find those items. The agents opened the tackle box to search for items covered by the warrant, and, once the box was opened, the contraband items not covered by the warrant were in plain view.

We agree. In general, "any container situated within residential premises which are the subject of a validly-issued warrant may be searched if it is reasonable to believe that the container could conceal items of the kind portrayed in the warrant." United States v. Rogers, 521 F.3d 5, 9-10 (1st Cir. 2008) (quoting United States v. Gray, 814 F.2d 49, 51 (1st Cir. 1987)) (internal quotation mark omitted). The warrant in this case

-13-

permitted agents to search for items as small as grains of powder. Thus, the agents had a right to search the tackle box. While lawfully searching the tackle box, agents saw what they believed to be contraband and evidence of a crime - ammunition and a cigarette rolling device.

A law enforcement agent may, without a warrant, seize an object in plain view so long as he or she has (1) lawfully reached the vantage point from which he sees the object, (2) has a right of access to the object itself, and (3) has probable cause to support his seizure of that object. United States v. Paneto, 661 F.3d 709, 713 (1st Cir. 2011). In this case, the agents satisfied the first requirement - lawfully reaching the vantage point from which they saw the ammunition and rolling device - because they were in the house pursuant to a warrant supported by probable cause. Second, as discussed, the warrant permitted agents to search for items as small as grains of powder. Thus, the agents had a right to access and open the tackle box. Once inside the tackle box - recognizing that both Jake and Stephen Crooker were unable to lawfully possess ammunition - the officers had probable cause to seize the ammunition, satisfying the third plain view requirement. Moreover, the rolling device, which agents believed was used to roll marijuana cigarettes, was in plain view within the tackle box and its value as evidence of illegal activity was immediately apparent.

Thus, the ammunition and rolling device were properly seized pursuant to the plain view doctrine.

With regard to Crooker's alternative argument, we need not decide whether the agents acted reasonably in seizing the entire tackle box instead of separating out the loose ammunition and rolling device and leaving the tackle box behind. The only item of evidentiary value that resulted from the seizure of the tackle box was trace marijuana residue. The government presented a wealth of other evidence supporting its allegation that Crooker possessed marijuana, including (1) three bags of leafy green substance recovered from different areas of the house, (2) the cigarette rolling device, (3) a bag of leafy green substance recovered from a cigarette pack on Crooker's person, and, most notably, (4) Crooker's confession that he used and possessed marijuana. Ignoring the residue completely, the evidence was sufficient to demonstrate that Crooker possessed marijuana. Thus, even if it was impermissible for agents to seize the entire tackle box and later examine it for residue, admission of that residue was harmless error. See United States v. Jiménez, 419 F.3d 34, 42 (1st Cir. 2005) (finding harmless error where erroneously admitted evidence "pales in light of the other evidence introduced at trial," including defendant's confession to the charged offense).

### 3.  The Warrant's Particularity

Crooker argues for the first time on appeal that the warrant lacked sufficient particularity to satisfy the requirements of the Fourth Amendment because it did not specifically describe the things to be seized.  Instead, it only permitted the seizure of "evidence, fruits, or instrumentalities" of violations of four enumerated statutory provisions.  Although he failed to timely raise this objection prior to trial pursuant to Federal Rule of Criminal Procedure 12(b)(3)(C), Crooker claims that the language in Rule 12(e) stating that "[a] party waives any Rule 12(b)(3) defense, objection, or request not raised by the deadline" means that such arguments are forfeited, not waived.  See Fed. R. Crim. P. 12(e).  Hence, he says he is entitled to plain error review of his particularity argument.

In United States v. Walker, 665 F.3d 212, 227-28 (1st Cir. 2011), where there was a failure to challenge a defect in an indictment under Rule 12(b)(3)(B), we rejected the argument that the waiver language in Rule 12(e) means forfeiture: "Rule 12(e) says what it means and means what it says" when it states that a 12(b)(3) defense not raised before trial is waived.  Walker, 665 F.3d at 228.  Crooker argues that the difference between a defective indictment and a ground for suppression warrants different treatment of the distinct 12(b)(3) claims under Rule 12(e). He cites language from Walker in support of this position:

> [T]he matters that fall within the compass of
> Rule 12(b)(3) (and thus Rule 12(e)) are
> normally correctable before trial if
> seasonably brought to the attention of the
> district court and the government. It strikes
> us as manifestly unfair for a defendant to sit
> silently by, take his chances with the jury,
> and then be allowed to ambush the prosecution
> through a post-trial attack. Accordingly, we
> join the majority view and hold that a failure
> to challenge a defect in an indictment before
> trial, as required by Rule 12(b)(3), results
> in an unreviewable waiver of that challenge
> pursuant to Rule 12(e).

Walker, 665 F.3d at 228.

Unlike a defective indictment, Crooker asserts, the government cannot fix suppression matters prior to trial. Here, for example, the government could not correct any particularity defects in the warrant. Moreover, Crooker says that he did not sit silently by and later ambush the prosecution. Instead, he filed a pre-trial motion to suppress, albeit on other grounds. He insists that "[a]lthough the government may not always have the incentive to present all of the facts if an issue is not raised below, if an issue can be resolved on the record before this Court, the government is not prejudiced by the initial failure to raise the issue and review for plain error is warranted."

The government argues that it could indeed be prejudiced by a defendant's failure to timely raise a ground for suppression. If appellate review of that omitted ground is successful, convictions may be vacated even though the government may have had other evidence of guilt that, with proper notice, could have been

-17-

introduced at trial. Furthermore, the timely presentation of suppression claims to the district court allows full development of the factual record and permits the government to appeal any adverse suppression decision prior to trial.

We agree with the government's position. There is the potential for both unfairness to the government and needless inefficiency in the trial process if defendants are not required, at the risk of waiver, to raise all of their grounds in pursuing a motion to suppress. Hence, the reasoning of Walker on the import of the waiver language of Rule 12(e) applies as well to the failure to include a particular ground in a motion to suppress. Of course, as we noted in Walker, defendants are not without recourse. If a defendant can show "good cause" for failing to timely raise a 12(b)(3) challenge, that challenge "may be entertained by the district court and reviewed on appeal." Walker, 665 F.3d at 228; see also Fed. R. Crim. P. 12(e).

Crooker argues that his trial counsel's failure to raise the particularity issue in the motion to suppress amounted to ineffective assistance of counsel, which in turn constituted good cause. We need not decide whether the government is correct that a defendant must bring his good cause argument to the attention of the district court before having it reviewed by this court. Even assuming arguendo that a good cause argument can be raised for the first time on appeal, and further assuming that a successful

ineffective assistance of counsel claim could constitute good cause, we would not be able to review Crooker's ineffective assistance of counsel claim because the record here is insufficiently developed.  See, e.g., United States v. Rodriquez, 675 F.3d 48, 56 (1st Cir. 2012) ("It is only in exceptional cases when there are no 'critical' facts in dispute and the record has been sufficiently developed that we will address an ineffective assistance of counsel claim on direct appeal.").

**B. Motion to Suppress Crooker's Statements**

"A person need not be under arrest for Miranda rights to arise[, b]ut he must be in 'custody.'"  United States v. Guerrier, 669 F.3d 1, 6 (1st Cir. 2011) (internal citation omitted); see also Miranda v. Arizona, 384 U.S. 436 (1966).  To determine whether a person was in custody for Miranda purposes, the district court looks to the circumstances surrounding the questioning and determines "whether those circumstances would cause a reasonable person to . . . underst[and] his situation to be comparable to a formal arrest."  Guerrier, 669 F.3d at 6.  "Several factors guide this analysis, including '(without limitation) where the questioning occurred, the number of officers, the degree of physical restraint, and the duration and character of the interrogation.'"  Id. (quoting United States v. Teemer, 394 F.3d 59, 66 (1st Cir. 2005)).  We review a district court's factual determinations about the circumstances surrounding the questioning

-19-

for clear error, and its legal conclusion about a reasonable person's understanding of those circumstances de novo. United States v. Hughes, 640 F.3d 428, 435 (1st Cir. 2011).

Crooker alleges that law enforcement agents failed to advise him of his Miranda rights, but nevertheless subjected him to a series of custodial interrogations on the day of the search. Crooker argues that he was interrogated on more than one occasion and that, under the totality of the circumstances, a reasonable person in his situation would not have felt free to leave. He notes that the environment was "police-dominated," with approximately thirty officers present during the execution of the search warrant, some of whom "forced [him] outside, at gunpoint, and searched him." He claims that he was escorted and followed by agents and that soon after being searched by the entry team, he was again frisked by other agents. He adds that the fact that he asked agents if he could leave illustrates that a reasonable person in those circumstances would not have felt free to leave. Moreover, he points to the testimony of Agent Curran, who stated that at the time of the search, he was unsure if Crooker was free to leave. Because he was subjected to custodial interrogations without the benefit of Miranda warnings, Crooker insists that the statements admitted against him should have been suppressed.

The district court disagreed. It found that the agents' interactions with Crooker were consensual – the officers asked

Crooker if they could talk to him and noted that there was "no testimony that there were any weapons drawn, any shouting, any use of profanity." The court found that Crooker freely walked around the property and that the officers were "fairly calm and polite and accommodating." The district court determined that "[t]here was no evidence that there was any imposition of any custody on Mr. Jake Crooker at the time of the conversations. This was simply not a custodial interrogation, Miranda didn't apply, and Mr. Jake Crooker's statements were all perfectly voluntary and knowing and intelligent."

Our review leads to the same conclusion. Crooker was questioned in familiar surroundings where, in general, questioning tends to be significantly less intimidating than questioning in unfamiliar locations. See Hughes, 640 F.3d at 435-36 ("Though questioning in a suspect's dwelling may at times comprise a custodial interrogation, such a location generally presents a less intimidating atmosphere than, say, a police station." (internal citation omitted)). Although there were numerous officers on the property, those officers holstered their guns after the entry team cleared the house and left them holstered throughout the afternoon-long search. Cf. id. at 436 (finding no custody where visible weapons remained holstered throughout visit to suspect's home). Moreover, although those officers were present inside and around Crooker's house, no more than two agents were in direct

-21-

conversation with Crooker at one time. Crooker was never physically restrained, and, in fact, moved freely about his property throughout the search, even leaving the property for some time after he was questioned. See id. (finding no custody where there was no "meaningful physical restraint" and any police escort was not so pervasive and close "as to intrude upon any intimate moment or private activity"). By all accounts, Crooker's interactions with the agents were cooperative and relatively brief. See Guerrier, 669 F.3d at 6 (finding no custody where interview atmosphere was "relatively calm and nonthreatening" and interview lasted approximately 20-25 minutes, "a relatively short time").

Given the familiarity of the surroundings in which Crooker was questioned, the calm and peaceable nature of the conversations between Crooker and agents, and the lack of physical restraint or show of force during questioning, we conclude that Crooker was not in custody for Miranda purposes. Thus, the agents' failure to advise Crooker of his Miranda rights was not a constitutional violation, and the district court did not err by denying Crooker's motion to suppress his statements.

Affirmed.