# United States Court of Appeals
## For the First Circuit

No. 09-1234

UNITED STATES OF AMERICA,

Appellee,

v.

RICHARD ELLISON,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Steven J. McAuliffe, U.S. District Judge]

Before

Torruella, Circuit Judge,

Souter, Associate Justice,[*] and Stahl, Circuit Judge.

Stephen Paul Maidman for appellant.
Donald Feith, Assistant United States Attorney, with whom John
P. Kacavas, United States Attorney, was on brief, for appellee.

April 15, 2010

---

[*]   The Hon. David H. Souter, Associate Justice (Ret.) of the
Supreme Court of the United States, sitting by designation.

**SOUTER, <u>Associate Justice</u>**.  While being held at a county jail charged with attempting to set fire to the building where his ex-girlfriend lived, defendant Richard Ellison indicated his willingness to give the police information about a pair of unsolved robberies elsewhere.  At an interview with a detective involved in the latter cases, Ellison said the girlfriend was the robber and admitted his own supporting role.  After being charged with aiding and abetting the crimes, he moved to suppress his statement.  The district court denied the motion, and we affirm.

I

On January 24, 2006, a woman attempted to rob a convenience store in Concord, New Hampshire, and when that effort went awry she held up the clerk at a nearby grocery store and made off with $300.  The following December Ellison was in jail in the State's north country, charged with trying to torch the dwelling of Robin Theriault, his ex-girlfriend and the beneficiary of a protective order he had recently been convicted of violating.  Ellison let it be known to a Berlin Police Department detective, who was speaking with him in connection with an unrelated investigation, that he could provide information about the Concord robberies.

The next day a Concord Police detective, Todd Flanagan, joined the Berlin officer in a second interview of Ellison, which took place in the jail library.  Ellison was brought there in

-2-

restraints, but these were removed at the request of Flanagan, who stated his understanding that Ellison wished to speak about the robberies. Flanagan told Ellison that he was not under arrest for these crimes, did not have to answer any questions, and was free to end the interview at any time by pushing a button on the table to summon the guards. Neither officer, however, advised Ellison of other rights subject to warnings required by <u>Miranda</u> v. <u>Arizona</u>, 384 U.S. 436 (1966). Ellison was calm, showed no surprise, and consented to a recorded interview, during which he disclosed his erstwhile romantic involvement with Theriault at the time of the robberies, identified her as the robber and implicated himself in a supporting role.

Ellison was then indicted for his part in the crimes, and, after the district court denied a motion to suppress his statement, he conditionally pleaded guilty to aiding and abetting robbery, 18 U.S.C. §§ 1951 and 2, and aiding and abetting the possession of a firearm in furtherance of a crime of violence, 18 U.S.C. §§ 924(c) and 2. Here, Ellison contends that suppression was required because there were no <u>Miranda</u> warnings, the statement was coerced by a broken promise of leniency, and he had invoked his Fifth and Sixth Amendment rights to counsel during the interview with Flanagan.

II

Miranda held that statements are generally inadmissible against a defendant if obtained during "custodial interrogation" without prior warnings that the suspect "has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." Miranda, 384 U.S. at 444. The central issue here is whether the interview in the library was custodial interrogation, as Ellison says, simply because incarceration makes any interrogation custodial per se within the meaning of Miranda.

Determinations about Miranda custody begin by examining all of the "circumstances surrounding the interrogation" and asking whether "a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave," Thompson v. Keohane, 516 U.S. 99, 112 (1995). This "initial determination . . . depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." Stansbury v. California, 511 U.S. 318, 323 (1994) (per curiam). Once a court finds that a reasonable person in the suspect's position would not have felt free to end the interview and walk away, there is a further question whether the suspect would reasonably find the circumstances coercive, thus raising the concern that drove

-4-

Miranda.  See Berkemer v. McCarty, 468 U.S. 420, 436-37 (1984) (acknowledging that "a traffic stop significantly curtails . . . 'freedom of action,'" and then deciding "whether a traffic stop exerts upon a detained person pressures that sufficiently impair his free exercise of his privilege against self-incrimination to require that he be warned of his constitutional rights").  In the paradigm example of interrogating a suspect at a police station, the answer is obvious, in the absence of unusual facts: that was the situation in Miranda and the warnings are the required antidote to the stationhouse pressures observed there.  Miranda is to be "enforced strictly . . . in those types of situations in which the concerns that powered the decision are implicated."  Id. at 437.

But in dealing with a case outside the Miranda paradigm, it is essential to recall that "the freedom-of-movement test identifies only a necessary and not a sufficient condition for Miranda custody."  Maryland v. Shatzer, 130 S.Ct. 1213, 1224 (2010).  That is, custody under Miranda means a suspect is not free to go away, but a suspect's lack of freedom to go away does not necessarily mean that questioning is custodial interrogation for purposes of Miranda.

Never is this distinction more important than when the subject of interrogation is independently incarcerated.  Even when he is given the option to end the interrogation as he chooses, he is not in the position of a suspect who is free to walk away and

-5-

roam around where he pleases, see, e.g., Oregon v. Mathiason, 429 U.S. 492, 495 (1977). Still, the restrictions on his freedom do not necessarily equate his condition during any interrogation with Miranda custody. While the suspect in a case just like Miranda may well feel that the only way to end the pressure on him is to answer the questions, the usual circumstances of someone serving prison time following a conviction characteristically save him from any such apprehension; so long as he is not threatened with harsher confinement than normal until he talks, he knows that the worst that can happen to him will be his return to prison routine, and that he will be back on the street (in most cases) whether he answers questions or refuses. See Shatzer, 130 S.Ct. at 1224-25. Accordingly, the Supreme Court concluded in Shatzer that "lawful imprisonment imposed on conviction of a crime does not create the coercive pressures identified in Miranda," id. at 1224.[1]

Shatzer left open the question whether those pressures are necessarily brought to bear on someone who is incarcerated

---

[1] In Mathis v. United States, 391 U.S. 1 (1968), a suspect's answers incriminating him in tax fraud, given to federal investigators while he was imprisoned on a state conviction, were held inadmissible because no Miranda warnings had been given. The Court acknowledged Miranda's applicability to questioning "'when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way,'" id. at 5 (quoting 384 U.S. at 478), but did not say whether the interview with Mathis fell within Miranda because of his incarceration or because of some other deprivation that was significant in the circumstances. Although it did not address Mathis, the Court's opinion in Shatzer forecloses Ellison's reading of the case for the former proposition.

before trial and then interviewed about a crime distinct from the pending charges. It is true that the condition of someone being held while awaiting trial, like Ellison, is not exactly the same as the convict's position, since the suspect might reasonably perceive that the authorities have a degree of discretion over pretrial conditions, at least to the point of making recommendations to a court. But we see nothing in the facts of this case that would be likely to create the atmosphere of coercion subject to <u>Miranda</u> concern. As mentioned, Detective Flanagan told Ellison that he was not under arrest for the robberies and that he did not have to answer any questions. He was interviewed in the prison library (presumably one of its more comfortable areas), he was not restrained, and he could go from the library at any time after pressing the button to summon the guards.[2]

The relatively low atmospheric pressure in these circumstances is all the more obvious in light of Ellison's previously expressed desire to tell the Concord police about the unsolved crimes; Ellison had suggested such an interview, and Flanagan was there to take him up on his proposal. And viewed

---

[2] On these facts, there would, of course, be no conclusion of custodial interrogation in those circuits that have previously applied the rule that such interrogation of a prisoner occurs only when the suspect's restraint is more rigorous than the institutional norm. <u>See</u>, <u>e.g.</u>, <u>Garcia</u> v. <u>Singletary</u>, 13 F.3d 1487, 1491 (11th Cir. 1994); <u>United States</u> v. <u>Conley</u>, 779 F.2d 970, 973 (4th Cir. 1985); <u>Cervantes</u> v. <u>Walker</u>, 589 F.2d 424, 428 (9th Cir. 1978).

objectively, the record readily shows why someone in Ellison's position would wish to be there talking. Theriault, whom he had assaulted in violation of a protective order, and whose house he was charged with attempting to set alight, was his ex-girlfriend. The relationship had obviously gone sharply sour. At the very least, Ellison would not have hesitated to hurt her (again) and try to help himself by telling his story to the police. There is no reason to find the concern of coercion behind <u>Miranda</u> implicated here.

Ellison's remaining arguments have no foundation. He claims that the officers "coerced" him into speaking by means of a subsequently broken promise that he would not be prosecuted for his role in the robberies. The short answer to this is that the district court found that no such promise was made. The court credited Flanagan's testimony that Ellison was told only that his cooperation would be brought to the attention of the prosecutor, who would determine what benefit, if any, Ellison would receive. Ellison also argues that the interrogation should have ceased once he invoked his right to counsel. But the district court found as a fact that Ellison's testimony that he had demanded to speak with counsel "at least five times" was not credible (though the judge did conclude that "there probably was some discussion of counsel" that the officer "brush[ed] aside"). But even if Ellison had clearly expressed a desire to speak with a lawyer, he could not

have invoked any constitutional right to do that in a non-custodial interrogation conducted before he was formally charged.  See United States v. Wyatt, 179 F.3d 532, 537 (7th Cir. 1999) ("The Fifth Amendment right to counsel safeguarded by Miranda cannot be invoked when a suspect is not in custody . . . ."); United States v. Boskic, 545 F.3d 69, 84 (1st Cir. 2008) ("The Sixth Amendment takes hold when the investigation gives way to a prosecution . . . ."). Suppression could not, therefore, vindicate the Constitution.  In any event, the district court's finding pretermits any issue based on the requests alleged.

## III

The judgment of the district court is **affirmed**.