J-E03005-16

2017 PA Super 128

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA<br><br>Appellant<br><br>v.<br><br>RONALD GRANT CHAMPNEY<br><br>Appellee | IN THE SUPERIOR COURT OF PENNSYLVANIA<br><br><br><br><br><br><br><br>No. 714 MDA 2015 |

Appeal from the Order April 20, 2015
In the Court of Common Pleas of Schuylkill County
Criminal Division at No(s): CP-54-CR-0001243-1998

BEFORE: BENDER, P.J.E., BOWES, J., PANELLA, J., LAZARUS, J., OTT, J.,
STABILE, J., DUBOW, J., MOULTON, J., and RANSOM, J.

OPINION BY MOULTON, J.:                                 **FILED APRIL 26, 2017**

The Commonwealth of Pennsylvania appeals from the April 20, 2015 order entered by the Schuylkill County Court of Common Pleas granting Ronald Grant Champney's motion to suppress statements made to police on May 13, 1998. The trial court concluded that Champney unambiguously invoked his right to counsel during an interview with police on December 23, 1997 and that, as a result, the statements he made the next May were obtained in violation of his rights under ***Miranda v. Arizona***, 384 U.S. 436 (1966) and ***Edwards v. Arizona***, 451 U.S. 477 (1981). While we agree that Champney successfully invoked his right to counsel, we conclude that, pursuant to ***Maryland v. Shatzer***, 559 U.S. 98 (2010), there was a sufficient break in custody between the invocation and the later questioning to permit the police to question Champney again after obtaining a proper

waiver of his *Miranda* rights. Accordingly, we reverse the trial court's suppression of the May 13, 1998 statements.

This case arises from the 1992 shooting death of Roy Bensinger. A jury convicted Champney of first-degree murder in 1999 and sentenced him to death. The Supreme Court of Pennsylvania affirmed his judgment of sentence in 2003. *Commonwealth v. Champney*, 832 A.2d 403 (Pa. 2003), *cert. denied*, *Champney v. Pennsylvania*, 542 U.S. 939 (2004).

In 2005, Champney filed a timely Post Conviction Relief Act ("PCRA") petition. On June 3, 2008, the PCRA court granted Champney a new trial, finding that trial counsel was ineffective for, among other things, failing to seek suppression of statements Champney made to police on May 13, 1998, and October 8, 1998.[1] On April 24, 2013, an evenly divided Pennsylvania Supreme Court affirmed the PCRA court's grant of a new trial. *Commonwealth v. Champney*, 65 A.3d 386 (Pa. 2013), *cert. denied*, *Pennsylvania v. Champney*, 134 S.Ct. 1276 (2014).

Following remand, on February 6, 2015, Champney filed a motion to suppress statements he gave to Pennsylvania State Police ("PSP") Sergeant ("Sgt.") David Shinskie on November 25, 1997, December 23, 1997, May 13, 1998, and October 8, 1998. On March 13, 2015, the trial court held a

---

[1] For a discussion of the other grounds on which the PCRA court granted Champney post-conviction relief, *see Commonwealth v. Champney*, 65 A.3d 386, 395-96 (Pa. 2013) (Eakin, J.) (opinion in support of reversal).

suppression hearing, after which it set forth the following factual history

regarding these statements:

> On October 23, 1997, Champney was arrested and placed in Schuylkill County Prison in lieu of bail on unrelated arson charges.[2] Between then and October 8, 1998, Champney had four conversations regarding the Bensinger case with [Sgt.] Shinskie of the [PSP].
>
> . . .
>
> On November 25, [1997], Sgt. Shinskie accompanied [Trooper ("Tpr.") Denny] Grimm in transporting Champney from the county prison to his preliminary arraignment [on the unrelated charges at the Magisterial District Judge's ("MDJ") office.] Tpr. Grimm drove, and Sgt. Shinskie rode in the backseat with a cuffed Champney.
>
> At the hearing [on Champney's motion to suppress], Sgt. Shinskie testified that he was seizing upon every opportunity to talk with Champney about the Bensinger case. Sgt. Shinskie allowed Champney to read the arson complaint[3] and then advised him of his **_Miranda_** rights.

---

[2] In his brief, Champney states that he was first detained in the Schuylkill County Prison on October 23, 1997 pursuant to charges unrelated to the Bensinger homicide. A review of the relevant docket – CP-54-CR-0001206-1997 – shows that on October 23, 1997, Champney was preliminarily arraigned on a number of charges, including burglary, robbery, criminal attempt (theft by unlawful taking – moveable property), simple assault, terroristic threats, recklessly endangering another person, and criminal conspiracy, but not arson. The magisterial district judge set bail at $100,000 cash, and based on the docket it does not appear that Champney made bail on those charges.

[3] While Champney was charged with additional offenses on November 25, 1997, those charges do not appear to have included arson. The docket at CP-54-CR-0001277-1997 reveals that Champney was charged with theft by unlawful taking, receiving stolen property, and conspiracy. He was not charged with arson until June of 1998. **_See_** CP-54-CR-0000980-1998 and CP-54-CR-0000981-1998. However, this discrepancy does not change our

_(Footnote Continued Next Page)_

[Sgt. Shinskie]'s approach to Champney was to engage in low key conversation, giving Champney information that he had received during the investigation, and inviting Champney to comment. On the way back from the MDJ office, Champney was asked to return with the officers to the police station to make a statement. Champney responded that he would have to speak to an attorney before doing so. Instead of taking him to the police station, he was returned to the prison. The Commonwealth has referenced . . . no incriminating statements during this conversation.

Champney's preliminary hearing on the arson charges occurred on December 23, 1997. He was again transported there by [Sgt.] Shinskie and [Tpr.] Grimm in the same manner as before. Sgt. Shinskie again advised Champney of his ***Miranda*** rights. After some light conversation, Champney said, "I see you caught David Blickley." Sgt. Shinskie testified that Blickley was an associate of Champney and was suspected of committing burglaries and home invasions in the Philadelphia area. Blickley's ex-girlfriend was married to Bensinger at the time he was shot.

Sgt. Shinskie responded to Champney by acknowledging that Blickley had been caught and telling Champney that Blickley was giving information regarding the homicide and Champney's possible involvement. Champney said that he knew someone would have to take the blame. Shinskie asked if Beth Bensinger was involved, and Champney responded that there was no reason for her to be involved.

On the return trip to the prison, about one hour later, Sgt. Shinskie asked Champney if he shot Bensinger. Champney responded, "Before I make any kind of statement, I think I should talk to Frank Cori." Sgt. Shinskie knew that Frank Cori was an attorney who had

*(Footnote Continued)* ─────────────

analysis, as the timeline relevant to Champney's statements remains the same. While the charges may be different, Champney was still charged on November 25, 1997, preliminarily arraigned that same day, and had a preliminary hearing on December 23, 1997.

- 4 -

represented Champney. He was returned to the prison with no more conversation of note.

The next contact by [Sgt.] Shinskie with Champney occurred on May 13, 1998. Sgt. Shinskie accompanied Detective Pummer of the Lehigh County District Attorney's Office to see Champney at the prison. Detective Pummer wanted to question Champney about an arson in Allentown. They met with Champney in a prison conference room. Champney was advised of his **Miranda** rights and signed a waiver form.

After some questions regarding arsons in Allentown and Tremont, Sgt. Shinskie told Champney that he believed he could put together probable cause for homicide charges against Champney. In response, Champney asked what he was looking at. When [Sgt.] Shinskie replied that he did not know, because he could not make deals, Champney told him to go get Cal Shields, who was then the [Schuylkill County] District Attorney. After an unsuccessful attempt to locate Mr. Shields, [Sgt.] Shinskie returned to the conversation with Champney.

When Sgt. Shinskie noted that a .30 caliber firearm was used to kill Bensinger, Champney said "Yeah. The guns are kept in a locker in the basement of the home." [Sgt.] Shinskie told Champney that he understood the gun was destroyed. Champney responded, "That's a lie. The gun is not destroyed. I know who has the gun. And they might have sold it or have it somewhere. But that's a lie. It was not destroyed." When [Sgt.] Shinskie told Champney that Chris Reber was involved, Champney replied, "No he's not involved. He only dropped me off."

The last conversation between Sgt. Shinskie and Champney occurred on October 8, 1998. On that date, Champney was arrested in the instant case. [Sgt.] Shinskie and [Tpr.] Grimm transported Champney from the county prison to their barracks. Along the way, [Sgt.] Shinskie commented that Beth Bensinger had made some interesting statements concerning Champney's involvement in the Roy Bensinger shooting. [Sgt.] Shinskie testified that his goal was to get Champney to comment. Champney replied that she probably got immunity.

- 5 -

> Also on the way, [Champney] was given the affidavit of probable cause to read and thereafter stated that it did not matter because he was going to die anyway. When [Sgt.] Shinskie asked what Champney meant, he said he had tuberculosis and was going to tell his attorney not to appeal so his death would come sooner. Once they arrived at the barracks, Champney was read his ***Miranda*** rights and signed the waiver form.

Trial Ct. Op., 4/20/15, at 1-5.

On April 20, 2015, the trial court entered an order granting the motion to suppress in part. It suppressed the statements made on May 13 and October 8, 1998,[4] but denied the motion with respect to the statements made on December 23, 1997. On April 21, 2015, the Commonwealth filed a timely notice of appeal, certifying that the suppression order "will terminate or substantially handicap the prosecution."[5] ***See*** Pa.R.A.P. 311(d). On June 23, 2016, a panel of this Court affirmed the trial court. The Commonwealth filed a petition for reargument *en banc*, which this Court granted on September 2, 2016.

The Commonwealth raises two[6] issues on appeal:

_____

[4] The trial court found that neither the Commonwealth nor Champney identified a statement from the November 25, 1997 conversation that the Commonwealth would want to offer as evidence. Trial Ct. Op. at 6.

[5] In its Pennsylvania Rule of Appellate Procedure 1925(a) opinion, the trial court adopted in full its April 20, 2015 opinion. ***See*** Opinion of Court Pursuant to Pa.R.A.P. 1925, 5/28/15.

[6] In its Rule 1925(b) statement, the Commonwealth also challenged the suppression of Champney's October 8, 1998 statements. However, the
*(Footnote Continued Next Page)*

1. Did the lower court err in granting the motion to suppress statements made to law enforcement authorities on May 13, 1998 where Champney failed to make a clear and unambiguous invocation of his right to counsel?

2. Did the lower court err in granting the motion to suppress statements made to law enforcement authorities on May 13, 1998 when there was a sufficient break in Champney's custody to end the presumption of involuntariness established in *Edwards v. Arizona*, 451 U.S. 477 (1981)?

Cmwlth.'s Br. at 4 (trial court answers omitted). Both issues address the suppression of Champney's statements on May 13, 1998. Our standard of review on such matters is well-settled:

> When the Commonwealth appeals from a suppression order, this Court follows a clearly defined scope and standard of review. We consider only the evidence from the defendant's witnesses together with the evidence of the prosecution that, when read in the context of the entire record, remains uncontradicted. This Court must first determine whether the record supports the factual findings of the suppression court and then determine the reasonableness of the inferences and legal conclusions drawn from those findings. In appeals where there is no meaningful dispute of fact, as in the case *sub judice,* our duty is to determine whether the suppression court properly applied the law to the facts of the case.

*Commonwealth v. Arthur*, 62 A.3d 424, 427 (Pa.Super. 2013) (internal citations and quotation marks omitted).

---

*(Footnote Continued)* ─────────────────

Commonwealth has voluntarily abandoned this issue. *See* Cmwlth.'s Br. at 4 n.1.

**Invocation of the Right to Counsel**

In its first issue, the Commonwealth argues that Champney did not effectively invoke his Fifth Amendment right to counsel on December 23, 1997 and, therefore, the May 13, 1998 statements are admissible. According to the Commonwealth, Champney's statement, "Before I make any kind of statement, I think I should talk to Frank Cori," was equivocal and ambiguous. Cmwlth.'s Br. at 23-24. The Commonwealth relies on **Davis v. United States**, 512 U.S. 452 (1994), in which the United States Supreme Court upheld the decision of lower courts that the suspect's use of the phrase, "Maybe I should talk to a lawyer," was not sufficiently clear to constitute an invocation of the right to counsel.[7] Cmwlth.'s Br. at 23. The Commonwealth asserts that Champney's use of the words "think" and "should" indicated that Champney was considering whether he should discuss the matter with his attorney before making a statement, rather than actually requesting to speak with his attorney. **Id.** Further, the Commonwealth states "Champney's words must be considered along with the description of his body language, demeanor, and voice intonation," **id.** at 25, suggesting implicitly that the trial court failed to do so.

---

[7] The issue before us concerns Champney's Fifth Amendment right to counsel under **Miranda**, as opposed to the Sixth Amendment right to counsel that attaches when the Commonwealth initiates adversary judicial proceedings. **See, e.g., Commonwealth v Romine**, 682 A.2d 1296, 1298-99 (Pa.Super. 1996) (discussing differences between right to counsel under Fifth and Sixth Amendments).

In **Miranda**, the United States Supreme Court established that an accused has the right to have counsel present during custodial interrogations under the Fifth and Fourteenth Amendments to the United States Constitution. 384 U.S. at 474. This right to counsel is part of "a set of prophylactic measures designed to safeguard the constitutional guarantee against self-incrimination." **J.D.B. v. North Carolina**, 564 U.S. 261, 269 (2011).

In **Edwards v. Arizona**, the Supreme Court addressed the consequences of a suspect's invocation of the right to counsel. The **Edwards** court held that "when an accused has invoked his right to have counsel present during custodial interrogation," police may not conduct further interrogations "until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." 451 U.S. at 484-85. If police conduct further interrogations outside the presence of counsel, "the suspect's statements are presumed involuntary and therefore inadmissible as substantive evidence at trial, even where the suspect executes a waiver and his statements would be considered voluntary under traditional standards." **McNeil v. Wisconsin**, 501 U.S. 171, 177 (1991).

To trigger these protections, a defendant's request for counsel must be sufficiently clear "that a reasonable police officer would understand the statement to be a request for an attorney." **Davis**, 512 U.S. at 459. In **Davis**, police officers were investigating a murder that occurred after the

victim lost a pool-game bet and refused to pay. *Id.* at 454. Naval criminal investigators focused on Davis when they discovered that he had been at the bar on the evening in question and owned a pool cue that was stained with blood. *Id.* Davis was brought in for questioning, provided his rights,[8] and waived his rights to remain silent and to counsel. *Id.* at 454-55. During the interview, Davis said, "Maybe I should talk to a lawyer." *Id.* at 455. In response, the criminal investigator reminded him of his right to counsel and asked Davis to clarify whether he wanted a lawyer. *Id.* Davis responded that he was not asking for a lawyer and did not want one. *Id.* However, one hour later, Davis said, "I think I want a lawyer before I say anything else," at which point investigators ended the interrogation. *Id.*

The *Davis* Court declined to disturb the conclusion of the lower courts that Davis's "maybe" statement was insufficiently clear to invoke his right to counsel. *Id.* at 462. The Court rejected the argument that an equivocal or ambiguous reference to counsel requires the police to stop questioning a suspect:

> We decline petitioner's invitation to extend *Edwards* and require law enforcement officers to cease questioning immediately upon the making of an ambiguous or equivocal reference to an attorney. The rationale underlying *Edwards* is that the police must respect a suspect's wishes regarding his right to have an attorney

---

[8] Because Davis was an active military service member and the killing took place on a naval base, Davis was given his rights under Article 31 of the Uniform Code of Military Justice. *See* 10 U.S.C. § 831.

present during custodial interrogation. But when the officers conducting the questioning reasonably do not know whether or not the suspect wants a lawyer, a rule requiring the immediate cessation of questioning "would transform the **Miranda** safeguards into wholly irrational obstacles to legitimate police investigative activity," **Michigan v. Mosley**, 423 U.S. 96, 102 . . . (1975), because it would needlessly prevent the police from questioning a suspect in the absence of counsel even if the suspect did not wish to have a lawyer present. Nothing in **Edwards** requires the provision of counsel to a suspect who consents to answer questions without the assistance of a lawyer.

*Id.* at 459-60 (some internal citations omitted). The Court went on to conclude that while "it will often be good police practice for the interviewing officers to clarify whether or not [a suspect] actually wants an attorney," the officers need not do so; instead, they "may continue questioning until and unless the suspect clearly requests an attorney." *Id.* at 461.

The inquiry into whether or not a suspect has invoked the right to counsel is an objective one. *Id.* at 459. The *Davis* Court explained that a suspect "must articulate his desire to have counsel present **sufficiently clearly that a reasonable police officer in the circumstances would understand the statement be a request for an attorney**." *Id*. (emphasis added). However, if the statement is "ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel," police are not required to cease questioning. *Id.* (emphasis in original).

Our task, then, is to determine whether Champney "articulate[d] his desire to have counsel present sufficiently clearly that a reasonable police

officer in [Sgt. Shinskie's] circumstances would understand the statement be a request for an attorney." ***Id.*** In undertaking that task, we look not only to the specific words used by Champney, but also at the surrounding circumstances.[9]

The first interaction between Champney and Sgt. Shinskie took place on November 25, 1997, while Champney was detained in county prison on unrelated charges. N.T., 3/13/15, at 3-4 ("N.T."); ***see also*** note 2, ***supra***. In an effort to gain information about the Bensinger homicide, Sgt. Shinskie went with another state trooper to the prison to serve Champney with a warrant on other unrelated charges and then rode with Champney in a police cruiser to his preliminary arraignment on those charges.[10] N.T. at 4-5. Sgt.

_____

[9] Because context matters, various federal and state appellate courts have reached different results when analyzing language similar to that used in ***Davis*** and here. ***Compare United States v. Mohr***, 772 F.3d 1143, 1146 (8th Cir. 2014) (defendant's statement "I think I should get [a lawyer]" was not an unequivocal invocation of right to counsel) ***and State v. Carter***, 172 So.3d 538, 539-40 (Fla. Dist. Ct. App. 2015) (defendant's statement that "I think I should wait to talk with my public defender," followed by statement that he wanted to tell "the whole truth" was not unambiguous invocation of right to counsel) ***with People v. Romero***, 953 P.2d 550, 557 (Colo. 1998) (defendant's statement that "I think I should talk to a lawyer" in response to question about self-defense rationale was sufficient invocation) ***and Wood v. Ercole***, 644 F.3d 83, 87, 90-92 (2d Cir. 2011) (defendant's statement "I think I should get a lawyer," made before giving videotaped statement was sufficient to invoke right to counsel).

[10] The Commonwealth does not dispute the trial court's conclusion that Champney was subject to custodial interrogation on November 25, 1997 during the rides from prison to the arraignment and back, as Champney was questioned by Sgt. Shinskie while "[hand]cuffed, riding in a moving police vehicle, and in the company of two armed officers." Trial Ct. Op. at 7.

Shinskie wanted Champney to confirm some statements that he had received from other witnesses. *Id.* at 5-6. Eventually, Sgt. Shinskie asked Champney if he would be willing to come to the PSP barracks and give a statement, to which Champney responded that he would have to speak to an attorney before going to the barracks. At that point the interrogation ended and Champney was returned to prison. *Id.* at 6-7.

On December 23, 1997, Tpr. Grimm and Sgt. Shinskie transported Champney from the prison to his preliminary hearing on the charges filed in November. *Id.* at 7-8. Sgt. Shinskie again sat in the backseat of the PSP cruiser with Champney while Tpr. Grimm drove. *Id.* at 8. After Sgt. Shinskie gave Champney his *Miranda* warnings, Sgt. Shinskie and Champney engaged in small talk until Champney said, "I see you caught Dave Blickley." *Id.* at 9. Because Blickley was loosely connected to the Bensinger investigation,[11] Shinskie responded by acknowledging that Blickley was in custody and that "he was giving information concerning the Roy Bensinger homicide and also Mr. Champney's possible involvement." *Id.* at 9-10. Champney then said that "he knew somebody was going to have to take the blame for this." *Id.* at 10. When Sgt. Shinskie then asked whether

---

[11] Sgt. Shinskie testified that Blickley was a "friend or associate of . . . Champney" who had prior contacts with law enforcement and whose "ex-wife was married to . . . Bensinger, prior to his demise." N.T. at 9.

Beth Bensinger was involved, Champney said "that's ridiculous" and/or "there's no reason for her to be involved in it." *Id.*

After reviewing the history of Champney's relationship with Beth Bensinger, Sgt. Shinskie told Champney that Dave Blickley appeared to be "clearing . . . his slate by offering information concerning the Bensinger homicide" and urged Champney to "step up" and discuss his involvement. *Id.* at 12. Sgt. Shinskie then asked Champney, "Did you shoot Roy Bensinger?" *Id.* at 14. Champney "mumbled or stammered, hesitated a little bit, and then said, 'Before I make any kind of statement, I think I should talk to Frank Cori.'" *Id.* Sgt. Shinskie, who knew Cori was an attorney, then stopped the interrogation. *Id.* at 55.[12]

---

[12] Before the trial court, Champney argued that his statements on December 23, 1997 should be suppressed because he invoked his right to counsel on November 25, 1997, and, therefore, the *Edwards* presumption applied to his December statements. The trial court rejected this argument, finding that while Champney may have invoked his right to counsel on November 25, 1997, on December 23, 1997 Champney initiated the conversation about the homicide, thus eliminating, albeit temporarily, the *Edwards* presumption. Trial Ct. Op. at 8-9. Because Champney re-initiated the discussion of the homicide on December 23, any earlier invocation of his right to counsel on November 25 no longer barred Sgt. Shinskie from further interrogation. *See Edwards*, 451 U.S. at 485 (after the right to counsel had been asserted by an accused, further interrogation of the accused should not take place "unless the accused himself initiates further communication, exchanges, or conversations with the police."); *see also Commonwealth v. Poplawski*, 130 A.3d 697, 712 (Pa. 2015) (quoting *Commonwealth v. Hubble*, 504 A.2d 168, 175 (Pa. 1986)) ("[A] confession given after a defendant invokes his right to counsel need not be suppressed where the defendant: '(1) initiated further communication, exchanges, or conversations with the police, and (2) knowingly and intelligently waived the right to counsel.'"). As a result, the admissibility of

*(Footnote Continued Next Page)*

The trial court, noting that Sgt. Shinskie knew "Frank Cori was an attorney," concluded that "[t]his request by Champney for counsel before giving any further statements was clear and unambiguous." Trial Ct. Op. at 12.[13] We agree with the trial court and conclude that Champney's statement was "sufficiently clear[] that a reasonable officer in the circumstances would understand the statement to be a request for an attorney." *Davis*, 512 U.S. at 459. In other words, Champney's request to speak to Frank Cori, in context, was sufficiently "unequivocal" and "unambiguous" to satisfy *Davis* and secure the protections of *Edwards*.[14]

At the time of Champney's request, Sgt. Shinskie knew that Frank Cori was an attorney.[15] N.T. at 28, 38, 55. Sgt. Shinskie also knew that when

*(Footnote Continued)* _____

Champney's statements on May 13, 1998 turns first on whether Champney effectively invoked his right to counsel later on December 23, 1997, **after** he re-initiated his discussion with Sgt. Shinskie.

[13] The court further observed that Champney's statement was similar to the defendant's second reference to counsel in *Davis*, and "in both instances, the agents in *Davis* and Sgt. Shinskie had no trouble construing the suspect's statement that he 'thinks' he wants to see an attorney as a request for counsel." Trial Ct. Op. at 11-12. We note that the *Davis* Court did not discuss the second statement made by the defendant except to note that it ended the interrogation. Rather, its analysis focused on Davis's equivocal "maybe" statement. *See Davis*, 512 U.S. at 462.

[14] We agree with Champney and the Commonwealth that Sgt. Shinskie's questioning on December 23, 1997 was a "custodial interrogation" under *Miranda*.

[15] In its suppression ruling, the trial court found that "Sgt. Shinskie was aware that Frank Cori was an attorney who was associated with Champney." Trial Ct. Op. at 12. However, Sgt. Shinskie only testified that

*(Footnote Continued Next Page)*

he had earlier asked Champney to give a statement about the Bensinger homicide on November 25, 1997, Champney stated that he would have to speak to an attorney before going to the police barracks to do so. *Id.* at 6-7. Under these circumstances, where Champney was in custody, was asked directly whether he had committed a murder,[16] and identified a particular lawyer known to his interrogator, a reasonable officer would conclude that Champney "*actually invoked* his right to counsel," *Davis* at 458 (emphasis in original) (quoting *Smith v. Illinois*, 469 U.S. 91, 95 (1984)), rather than merely making what "*might* be a request for an attorney," *id.* at 461 (emphasis in original).

The Commonwealth emphasizes Champney's use of the words "think" and "should," arguing that his statement was, as a result, "a communication fraught with indetermination." Cmwlth.'s Br. at 24. This focus is too narrow. Rather, the question is whether, under these specific circumstances, including his prior request for counsel and his reference to a particular attorney with whom Sgt. Shinskie was familiar, Champney's

_(Footnote Continued)_ ────────

he knew that Frank Cori was an attorney. When asked by the Commonwealth if he knew "whether or not Mr. Cori was representing Mr. Champney," he said "No, I did not." N.T. at 55. Nevertheless, our conclusion that Champney sufficiently invoked his right to counsel depends only on Sgt. Shinskie's knowledge that Cori was a lawyer, not on whether he knew Cori's relationship to Champney.

[16] The Commonwealth does not dispute that Champney was subject to custodial interrogation at the time he made the statement.

statement "can reasonably be construed to be an expression of desire for the assistance of an attorney." *Davis*, 512 U.S. at 459 (quoting *McNeil*, 501 U.S. at 178.) Underscoring that "a suspect need not speak with the discrimination of an Oxford don," *id.* at 459 (internal quotation marks and citation omitted), we have little trouble concluding that Champney, despite his use of arguably qualifying language, "actually request[ed] an attorney." *Id.* at 462; *see also id.* at 459 ("a statement either is such an assertion of the right to counsel or it is not") (quotation omitted).[17]

The Commonwealth's suggestion that the trial court did not adequately consider Champney's "body language, demeanor and voice intonation," Cmwlth.'s Br. at 25, is unavailing. The trial court heard testimony about the circumstances surrounding Champney's statement, including body language, demeanor, and tone. *See* N.T. at 14-15, 29-30. While the trial court may not have mentioned these facts in its opinion, it was undoubtedly aware of

_____

[17] The Commonwealth also asks us to consider Champney's statements in light of *Commonwealth v. Kunkle*, 79 A.3d 1173 (Pa.Super. 2013), in which a panel of this Court concluded that a defendant's phone call to her attorney's office (her attorney was unavailable), made with the assistance of her interrogator, was not a "sufficient articulation of her desire to have counsel present for the interview such that her statements require suppression." *Id.* at 1185. *Kunkle*, however, is inapposite. There, when the defendant was brought to the police barracks, "she asked if she could contact an attorney" prior to being given her *Miranda* warnings. *Id.* at 1184. We concluded that the appellant's statement was equivocal because it was not a "sufficient articulation of her desire to have counsel present **for the interview** such that her statements require suppression." *Id.* at 1185 (emphasis added). In contrast, Champney's request was to speak with an attorney **before answering any further questions**.

their possible relevance,[18] and nothing in the record or the opinion suggests that the trial court disregarded them in rendering its decision. We decline the Commonwealth's invitation to give more weight to these factors than did the trial court.

Alternatively, the Commonwealth contends that the trial court impermissibly relied on Sgt. Shinskie's "elect[ion] to cease his questioning of Champney," arguing that "that fact is irrelevant to the analysis." Cmwlth.'s Br. at 28. The Commonwealth argues that Sgt. "Shinskie's personal belief as to the meaning of Champney's ambiguous statement does not dictate the outcome" and, were we to affirm the trial court, such a ruling would "operate to punish those law enforcement officers who take a conservative approach by ceasing further questioning when faced with an equivocal request for counsel." *Id.* at 30.

While we agree with the Commonwealth that the *Davis* inquiry is objective, *see Davis*, 512 U.S. at 459, the Commonwealth's argument appears to conflate Sgt. Shinskie's knowledge of relevant facts with Sgt. Shinskie's subjective belief as to what Champney meant by his statement. *Davis* requires us to make an objective determination as to whether a

---

[18] In a 2013 opinion in support of reversal of the grant of a new trial in this case, three Justices suggested that examination of tone, demeanor, emphasis, and body language would assist in assessing the ambiguity or equivocality of Champney's statements. *See Champney*, 65 A.3d at 404 (Eakin, J., joined by Castille, C.J., and McCaffery, J.).

reasonable police officer, **under the circumstances**, would construe Champney's statement as a request for counsel.  While Sgt. Shinskie's subjective belief as to whether Champney's statement was sufficiently clear to invoke his right to counsel may not be relevant to that inquiry, his knowledge of relevant facts, such as that Frank Cori was a lawyer possibly associated with Champney, and that Champney had earlier invoked his right to counsel,  plainly is relevant.  Those facts are part of the circumstances under which Champney gave his statement.  The trial court's observation that Sgt. Shinskie "had no trouble construing [Champney's] statement . . . as a request for counsel," Trial Ct. Op. at 12, was no more than a confirmation of its appropriately objective analysis.

**Break in Custody**

In its second issue, the Commonwealth argues that, even if Champney had invoked his Fifth Amendment protection on December 23, 1997, by May 13, 1998 he had experienced a sufficient "break in custody" under **Maryland v. Shatzer**, 559 U.S. 98 (2010), that the police were permitted to approach him again despite that earlier invocation.  In other words, the Commonwealth contends that because **Edwards** operates as a bar to further interrogation only so long as the suspect remains in **Miranda** custody, and because **Shatzer** holds that ordinary incarceration is not the same as **Miranda** custody, there was no constitutional bar to the May 13, 1997 interrogation.

The trial court rejected this argument and concluded that because Champney was a pre-trial detainee and not serving a sentence for a prior conviction, the rationale of *Shatzer* does not apply. Surprisingly, Champney's brief does not address the *Shatzer* break-in-custody analysis, or discuss or even cite *Shatzer*.[19] Champney instead contends, in apparent conflict with the time limit adopted in *Shatzer*, that "[t]here is no proper length of time permitted to allow an officer to keep using tactics to elicit a confession." Champney's Br. at 21. Champney concludes that the *Edwards* presumption therefore applies to his May 13, 1998 statements. *Id.* at 18-21. Proper evaluation of these arguments requires a discussion of the rationale for the rule in *Edwards*, the meaning of *Miranda* custody, and the distinction between *Miranda* custody and ordinary incarceration.

As noted above, the *Edwards* Court held that "when an accused has invoked his right to have counsel present during custodial interrogation," police may not conduct further interrogations "until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." 451 U.S. at 484-85. The purpose of the *Edwards* rule is to prevent police from "tak[ing] advantage

_____

[19] Champney's lack of a response to the Commonwealth's *Shatzer* argument is particularly perplexing given the discussion of the issue by the trial court and the emphasis placed on the case by the Commonwealth in its initial brief as the appellant in this matter.

of the mounting coercive pressures of prolonged police custody . . . by repeatedly attempting to question a suspect who previously requested counsel until the suspect is badgered into submission." **Shatzer**, 559 U.S. at 105 (internal quotations omitted). In other words, **Edwards** and its progeny are designed to protect against "the continued pressure that begins when the individual is taken into custody as a suspect and sought to be interrogated—pressure likely to 'increase as custody is prolonged.'" **Id.** (quoting **Minnick v. Mississippi**, 498 U.S. 146, 153 (1990)). In cases following **Edwards**, the Court concluded that a police officer could not question a suspect who had invoked his right to counsel and been held in interrogative custody for three days, even though the re-interrogation concerned a separate incident, **see Arizona v. Roberson**, 486 U.S. 675 (1988), and could not re-interrogate a custodial suspect without counsel two days after the suspect had invoked his right to counsel, even though he had consulted with counsel in the interim, **see Minnick**, 498 U.S. at 153. In both **Roberson** and **Minnick**, the Court concluded that the defendants were still in **Miranda** custody because they were unable to "regain a sense of control or normalcy after they were initially taken into custody for the crime under investigation." **Shatzer**, 559 U.S. at 107.

In **Shatzer**, the Supreme Court directly addressed both the meaning of "custody" for **Miranda** purposes and how long it would take a defendant to "regain[] a sense of control or normalcy" after his initial custody. **Id.** Acting on allegations that Shatzer had sexually abused his three-year-old

son, a police detective went to interview Shatzer at the prison where he was serving a sentence on unrelated charges. *Id.* at 100-01. Shatzer waived his *Miranda* rights and the detective began to question him about the allegations. *Id.* at 101. Once Shatzer understood that the detective was asking about the sexual-abuse allegations, not the crime for which he was already serving time, Shatzer invoked his right to counsel. *Id.* The detective then ended the interview and Shatzer returned to general prison population. *Id.*

Two years and six months later, the police received more specific allegations about the same sexual-abuse allegations and a different detective went to re-interrogate Shatzer. *Id.* Shatzer waived his *Miranda* rights and eventually made incriminating statements. *Id.* at 101-02. After being charged with various sexual offenses, Shatzer filed a pre-trial motion to suppress his statements to the police. *Id.* at 102. The trial court denied Shatzer's motion, reasoning that he "had experienced a break in custody for *Miranda* purposes" between interrogations. *Id.* The Court of Appeals of Maryland reversed and remanded, holding that there was no break-in-custody exception to *Edwards* and, even if such an exception existed, "Shatzer's release back into the general prison population did not constitute a break in custody." *Id.* at 103.

The Supreme Court reversed. *Id.* The Court first examined the circumstances in the "paradigm *Edwards* case[,]" where a suspect is "coerced or badgered into abandoning his earlier refusal to be questioned

without counsel[,]" and "he remains cut off from his normal life and companions, thrust into and isolated in an unfamiliar, police-dominated atmosphere, . . . where his captors appear to control his fate." *Id.* at 106 (internal citations and quotation marks omitted). Then the Court considered a scenario where a suspect is released from pretrial custody and is "returned to his normal life for some time before the later attempted interrogation." *Id.* at 107. In contrast to the situations presented by *Edwards*, *Roberson*, and *Minnick*, where the suspects did not "regain[] a sense of control of normalcy after they were initially taken into custody for the crime under investigation," *id.* at 107, the Court found that its hypothetical scenario did not require the extension of the protections afforded by *Edwards*. The Court reasoned:

> When, unlike what happened in [*Edwards*, *Roberson*, and *Minnick*], a suspect has been released from his pretrial custody and has returned to his normal life for some time before the later attempted interrogation, there is little reason to think that his change of heart regarding interrogation without counsel has been coerced. He has no longer been isolated. He has likely been able to seek advice from an attorney, family members, and friends. And he knows from his earlier experience that he need only demand counsel to bring the interrogation to a halt; and that investigative custody does not last indefinitely. In these circumstances, it is far fetched to think that a police officer's asking the suspect whether he would like to waive his *Miranda* rights will any more "wear down the accused," *Smith v. Illinois*, 469 U.S. 91, 98 . . . (1984) (*per curiam*), than did the first such request at the original attempted interrogation—which is of course not deemed coercive. His change of heart is less likely attributable to "badgering" than it is to the fact that further deliberation in familiar surroundings has caused him to believe (rightly or

- 23 -

wrongly) that cooperating with the investigation is in his interest. Uncritical extension of *Edwards* to this situation would not significantly increase the number of genuinely coerced confessions excluded. The "justification for a conclusive presumption disappears when application of the presumption will not reach the correct result most of the time." *Coleman v. Thompson*, 501 U.S. 722, 737 . . . (1991).

*Id.* at 107-08 (footnote omitted). Therefore, the Court determined that the *Miranda* protections alone, without the conclusive *Edwards* presumption, adequately protected the rights of a suspect who requested counsel but was "reinterrogated after a break in custody . . . of sufficient duration to dissipate its coercive effects." *Id.* at 109.

The Court then addressed the question of what constitutes a break in custody of "sufficient duration" to permit the police to approach the suspect again for further questioning. Recognizing the risk of police abuse if *Edwards* could be evaded by a brief release and prompt re-arrest, the Court concluded that "14 days . . . provides plenty of time for the suspect to get reacclimated to his normal life, to consult with friends and counsel, and to shake off any residual coercive effects of his prior custody." *Id.* at 110.

The Court next examined whether Shatzer's break between interrogations constituted a break in *Miranda* custody. Shatzer was incarcerated for the entire time between interrogations, so in one sense he was plainly in "custody." *Id.* at 112. The Court made clear, however, that incarceration and *Miranda* custody are not one and the same:

Interrogated suspects who have previously been convicted of crime live in prison. When they are released

back into the general prison population, they return to their accustomed surroundings and daily routine—they regain the degree of control they had over their lives prior to the interrogation. Sentenced prisoners, in contrast to the *Miranda* paradigm, are not isolated with their accusers. They live among other inmates, guards, and workers, and often can receive visitors and communicate with people on the outside by mail or telephone.

Their detention, moreover, is relatively disconnected from their prior unwillingness to cooperate in an investigation. The former interrogator has no power to increase the duration of incarceration, which was determined at sentencing. And even where the possibility of parole exists, the former interrogator has no apparent power to decrease the time served. This is in stark contrast to the circumstances faced by the defendants in *Edwards, Roberson,* and *Minnick,* whose continued detention as suspects rested with those controlling their interrogation, and who confronted the uncertainties of what final charges they would face, whether they would be convicted, and what sentence they would receive.

*Id.* at 113-14 (footnote omitted). The Court went on to

distinguish the duration of incarceration from the duration of what might be termed interrogative custody. When a prisoner is removed from the general prison population and taken to a separate location for questioning, the duration of *that separation* is assuredly dependent upon his interrogators. For which reason once he has asserted a refusal to speak without assistance of counsel *Edwards* prevents any efforts to get him to change his mind during that interrogative custody.

*Id.* at 113 n.8 (emphasis in original).

Based on the foregoing, the Court found that although Shatzer was incarcerated for the entire period between his invocation of the right to counsel and the later re-interrogation on the same subject, he nonetheless experienced a sufficient break in *Miranda* (or interrogative) custody that the

- 25 -

*Edwards* presumption no longer applied. *Id.* at 112-14. His later incriminating statements, obtained after fresh *Miranda* warnings and an appropriate waiver, were therefore admissible. *Id.* at 116-17.

Two years after *Shatzer*, the Supreme Court provided more guidance on the differences between incarceration on the one hand and *Miranda* or interrogative custody on the other. In *Howes v. Fields*, 565 U.S. 499 (2012), the Court addressed the question whether a prisoner, taken out of the general prison population for questioning, was in *Miranda* custody while being questioned. *Id.* at 517.[20] The Court explained that "[a]s used in our *Miranda* case law, 'custody' is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion," *id.* at 508-09, and that "[n]ot all restraints on freedom of movement amount to custody for purposes of *Miranda*," *id.* at 509. The Court further observed that "[w]e have decline[d] to accord talismanic power to the freedom-of-movement inquiry and have instead asked the additional question whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *Id.* (internal quotation marks and citations omitted). After concluding, based in part on

---

[20] The Supreme Court uses the term "custody" in conjunction with *Miranda* to "specif[y] circumstances that are thought generally to present a serious danger of coercion." *Fields*, 565 U.S. at 508-09. It has also used the term "interrogative custody" as a synonym for *Miranda* custody. *See, e.g., Shatzer*, 559 U.S. at 113 n.8.

*Shatzer*, that a "prisoner is [not] always in custody for purposes of *Miranda* whenever [he] is isolated from the general prison population and questioned about conduct outside the prison," *id.* at 508, the Court examined "all of the circumstances of the questioning" of Fields and held that he was "not in custody within the meaning of *Miranda*," *id.* at 517.

Along the way, the Court further explained why "imprisonment alone is not enough to create a custodial situation within the meaning of *Miranda*." *Id.* at 511.

> First, questioning a person who is already serving a prison term does not generally involve the shock that very often accompanies arrest. In the paradigmatic *Miranda* situation—a person is arrested in his home or on the street and whisked to a police station for questioning—detention represents a sharp and ominous change, and the shock may give rise to coercive pressures. A person who is "cut off from his normal life and companions," *Shatzer*, [559 U.S. at 106], and abruptly transported from the street into a "police-dominated atmosphere," *Miranda*, 384 U.S. at 456, may feel coerced into answering questions.
>
> By contrast, when a person who is already serving a term of imprisonment is questioned, there is usually no such change. "Interrogated suspects who have previously been convicted of crime live in prison." *Shatzer*, [559 U.S. at 113]. For a person serving a term of incarceration, we reasoned in *Shatzer*, the ordinary restrictions of prison life, while no doubt unpleasant, are expected and familiar and thus do not involve the same "inherently compelling pressures" that are often present when a suspect is yanked from familiar surroundings in the outside world and subjected to interrogation in a police station. *Id.* [at 103].
>
> Second, a prisoner, unlike a person who has not been sentenced to a term of incarceration, is unlikely to be lured into speaking by a longing for prompt release. When a person is arrested and taken to a station house for

interrogation, the person who is questioned may be pressured to speak by the hope that, after doing so, he will be allowed to leave and go home. On the other hand, when a prisoner is questioned, he knows that when the questioning ceases, he will remain under confinement. *Id.* [at 113 n.8].

Third, a prisoner, unlike a person who has not been convicted and sentenced, knows that the law enforcement officers who question him probably lack the authority to affect the duration of his sentence. *Id.* [at 113-114]. And "where the possibility of parole exists," the interrogating officers probably also lack the power to bring about an early release. [*Id.*] "When the suspect has no reason to think that the listeners have official power over him, it should not be assumed that his words are motivated by the reaction he expects from his listeners." [*Illinois v.*] *Perkins*, 496 U.S. [292, 297 (1990)]. Under such circumstances, there is little "basis for the assumption that a suspect . . . will feel compelled to speak by the fear of reprisal for remaining silent or in the hope of [a] more lenient treatment should he confess." *Id.* at [296-97].

In short, standard conditions of confinement and associated restrictions on freedom will not necessarily implicate the same interests that the Court sought to protect when it afforded special safeguards to persons subjected to custodial interrogation. Thus, service of a term of imprisonment, without more, is not enough to constitute *Miranda* custody.

*Id.* at 511-12.

Both Shatzer and Fields were serving prison sentences at the time they were questioned. Champney was not serving a sentence but instead was being held in county prison while awaiting trial on a host of separate charges. The question for us is whether this factual distinction makes a legal difference. We conclude that, under the circumstances before us, it does not.

In 2012, our Supreme Court observed that, in light of **Fields**, the question whether an unsentenced county prisoner may experience a **Shatzer** break in custody is an open one. **Commonwealth v. Keaton**, 45 A.3d 1050, 1068 n.9 (2012). Our research has uncovered very little decisional law on point. One notable exception is **United States v. Ellison**, 632 F.3d 727 (1st Cir. 2010), which like **Fields** involved the issue whether an inmate questioned in prison was in **Miranda** custody at the time. Unlike **Fields** and **Shatzer**, however, and like the case before us, the inmate in **Ellison** was not a sentenced convict but rather was awaiting trial on unrelated charges. Writing for a unanimous panel of the United States Court of Appeals for the First Circuit, retired Justice Souter concluded that the **Shatzer** analysis applied and the inmate in question, though not serving a sentence, was not in **Miranda** custody. **Id.** at 730.

Here, in contrast, the trial court concluded that **Shatzer** was inapplicable, reasoning that because Champney was a pre-trial detainee, he was continuously in **Miranda** custody and the conclusive **Edwards** presumption applied. Trial Ct. Op. at 15-16. The trial court stated that "Champney's situation was akin to that of the defendant in **Roberson**," in that "Champney was not a sentenced felon serving time[,] . . . was in jail only because he was awaiting trial on [unrelated] charges, and it was Sgt. Shinskie to whom Champney had invoked his right to have counsel present." **Id.** According to the trial court, because "Champney had no opportunity to return to the normalcy of the life he had before being arrested on the

[unrelated] charges," the **Edwards** presumption still applied when Sgt. Shinskie interrogated Champney on May 13, 1998. **Id.** at 15-16. The trial court's position, embraced by the panel decision in this case, is that the **Shatzer** break-in-custody analysis applies **only** to prisoners who are serving a sentence upon conviction, and **never** to prisoners not serving a sentence. We disagree.

Preliminarily, we note that the question required by **Shatzer** is not, as the trial court suggested, whether Champney had the chance to return to the normalcy of his pre-arrest life **outside of prison**. Rather, we must ask whether Champney's return to prison following the initial interrogation on December 23, 1997 represented the same sort of "return to normalcy" experienced by Shatzer after his initial interrogation, when he too was returned to the general prison population. In other words, when Champney was in county prison from December 23, 1997 until his re-interrogation on May 13, 1998, was he continuously subject to the same "inherently compelling pressures" contemplated by **Miranda**, or was he instead subject simply to "the ordinary restrictions of prison life." If the former, then Sgt. Shinskie was barred from re-approaching Champney until such time as he was either released from prison or convicted and sentenced on the pending charges. If the latter, then Champney experienced the sort of break in

*Miranda* custody, well longer than the 14-day minimum, that made the May 13, 1998 re-interrogation entirely lawful.[21]

After a careful review of *Shatzer* and *Fields*, we find no material difference for purposes of the break-in-custody analysis between the incarceration described in those cases and that experienced by Champney. Champney was not detained on the murder charge, but rather on separate offenses for which he had been held in the Schuylkill County Prison for failure to post bond or in lieu of bail. Champney's daily life in county prison between December 23, 1997 and May 13, 1998, so far as the record reveals, did not include the sort of coercive pressures inherent in "interrogative custody," *Shatzer*, 559 U.S. at 113 n.8, that *Miranda* and *Edwards* are meant to deflect.

First, Champney had been held in the prison since at least October 23, 1997. Thus, on May 13, 1998, Champney was not "abruptly transported from the street into a police-dominated atmosphere." *Fields*, 565 U.S. at 511 (internal quotation omitted). Rather, Champney had already been in the county prison for nearly six months, "liv[ing] among other inmates,

_____

[21] One longstanding criticism of an expansive reading of *Edwards*, addressed by the Supreme Court's decision in *Shatzer*, was that it created the "question-proof inmate," meaning that suspects who remained incarcerated after invoking their *Miranda* rights would be permanently immune from re-interrogation by authorities as long as they remained incarcerated. *See, e.g.,* Laurie Magid, *Questioning the Question-Proof Inmate: Defining* ***Miranda*** *Custody for Incarcerated Suspects*, 58 Ohio. St. L.J. 883, 895 (1997).

guards, and workers," and presumably provided the opportunity to "receive visitors and communicate with people on the outside by mail or telephone." *Shatzer*, 559 U.S. at 113. Although we recognize that the "harsh realities" of prison life may be unpleasant, *id.* at 113, Champney, much like the prisoners in *Shatzer* and *Fields*, had ample opportunity to adjust to "the ordinary restrictions of prison life, [which] are expected and familiar." *Fields*, 565 U.S. at 511.[22]

_____

[22] In concluding that Champney was in interrogative custody from December 23, 1997 through May 13, 1998, the trial court relied principally on the Supreme Court's decision in *Arizona v. Roberson*, 486 U.S. 675 (1988). There, the Court addressed the applicability of *Edwards* to statements made by a burglary suspect who invoked his right to counsel on arrest and then, after being held in police custody for three days, was approached by another police officer about a different burglary. *Id.* at 687-88. The *Roberson* court suppressed the resulting statements, declining the state's request that it create an exception to *Edwards* when officers question a suspect about a crime other than that of arrest. Here, the trial court found that because Champney was, like the suspect in *Roberson*, in custody but not serving a sentence upon conviction, *Shatzer* was distinguishable and the *Edwards* presumption applied to Champney's May 13, 1998 statements. Trial Ct. Op. at 12-16. We disagree.

While Champney was not serving a sentence, his custody in the county prison was fundamentally different from the interrogative detention of the burglary suspect in *Roberson*, who was in the continuous custody of his interrogators for three days. Indeed, in *Roberson* no one argued that the suspect was not in *Miranda* custody; instead, the government was asking for an exception to *Edwards* that would have permitted re-interrogation of a suspect still subject to such custody. Champney, in contrast, was awaiting trial in the county prison for over four months between interrogations, far removed from Sgt. Shinskie. *Roberson*, read in light of *Shatzer* and *Fields*, plainly does not cloak every incarcerated suspect with immunity from questioning simply because the suspect was not serving a sentence upon conviction.

Second, nothing in the record suggests that Sgt. Shinskie had the ability to free Champney from his incarceration on unrelated charges if he were to talk about the Bensinger homicide, or that Champney believed Sgt. Shinskie had that ability. Champney was awaiting prosecution on multiple charges from multiple incidents unrelated to Bensinger's death, which were proceeding through the court system. There was little risk that Champney, unlike a suspect in interrogative custody, felt "pressured to speak by the hope that, after doing so, he [would] be allowed to leave and go home." *Fields*, 559 U.S. at 511.[23] Champney could not rationally expect that answering questions or giving a statement about Bensinger's death would secure his freedom from the multitude of charges pending against him. Like the sentenced prisoners in *Shatzer* and *Fields*, Champney must have known "that when the questioning cease[d], he [would] remain under confinement." *Fields*, 559 U.S. at 511; *see also Ellison*, 632 F.3d at 730.

_____

[23] Justice Souter's analysis for the First Circuit in *Ellison* applies with equal force here:

> It is true that the condition of someone being held awaiting trial, like Ellison, is not exactly the same as the convict's position, since the suspect might reasonably perceive that the authorities have a degree of discretion over pretrial conditions, at least from the point of making recommendations to a court. But we see nothing in the facts of this case that would be likely to create the atmosphere of coercion subject to *Miranda* concern.

*Ellison*, 632 F.3d at 730.

Third, the duration of Champney's pre-trial detention was based on the unrelated charges pending against him, for which he either failed to make bail or was held in lieu of bail. Each time Champney ended a conversation with Sgt. Shinskie, he returned to the general prison population; nothing in the record suggests that police possessed the ability to reward Champney for cooperating in the Bensinger investigation or punish him for exercising his rights. Because Champney could not rationally believe that Sgt. Shinskie had power over his detention on the pending charges, he could not be "motivated by the reaction he expects from his listeners" and thus compelled to avoid "reprisal from remaining silent" or, conversely, "hope [for] more lenient treatment should he confess." *Fields*, 559 U.S. at 512. Under these circumstances, we conclude that Champney's incarceration was not the equivalent of *Miranda* custody and, therefore, that he experienced a break in such custody between December 23, 1997 and May 13, 1998.[24]

Finally, pursuant to *Shatzer*, we conclude that the nearly five-month break between Champney's invocation of his right to counsel and the prison interrogation removed the *Edwards* presumption of involuntariness and permitted Sgt. Shinskie to re-approach Champney, re-read him his rights,

---

[24] We do not intend to suggest that pre-conviction incarceration can never be the functional equivalent of *Miranda* custody. Rather, trial courts should examine, in light of *Shatzer* and *Fields*, the circumstances under which an unsentenced inmate is being held to determine whether that detainee is under *Miranda* custody.

and secure a valid waiver of those rights. Nothing in the record suggests that, between December 23, 1997 and May 13, 1998, police attempted to interrogate or even contact Champney about the Bensinger homicide or any other crime. This break between interrogations clearly exceeds the 14-day time bar established in **Shatzer**. Thus, Champney had ample time "to get reacclimated to his normal life, to consult with friends and counsel, and to shake off any residual coercive effects of his prior [**Miranda**] custody." **Shatzer**, 559 U.S. at 110.

As noted above, in his brief Champney does not address the applicability of **Shatzer**. He does, however, argue that his May 13, 1998 **Miranda** waiver was not knowing, intelligent, or voluntary.[25] As the

_____

[25] In addition to this general assertion, Champney contends in his brief to this Court that his May 13, 1998 **Miranda** waiver was not knowing, intelligent or voluntary because he waived his **Miranda** rights only in relation to the arson investigations in Lehigh and Schuylkill counties and not with respect to the Bensinger homicide investigation. Champney's Br. at 15-18. However, we conclude that Champney has waived this argument, as he failed to develop it by discussion or analysis of relevant legal authority. **See Lackner v. Glosser**, 892 A.2d 21, 29-30 (Pa.Super. 2006) ("[A]rguments which are not appropriately developed are waived . . . includ[ing] those where the party has failed to cite any authority in support of a contention"). Further, Champney did not raise this specific argument either in his suppression motion or before the trial court at the suppression hearing, and elected not to file a brief in support of his suppression motion.

Even had Champney preserved this argument, we would conclude that it does not merit relief. First, "a suspect's awareness of all the possible subjects of questioning in advance of interrogation is not relevant to determining whether the suspect voluntarily, knowingly, and intelligently waived his Fifth Amendment privilege." **Colorado v. Spring**, 479 U.S. 564, 577 (1987). Second, Champney cites neither relevant legal authority in

*(Footnote Continued Next Page)*

Commonwealth accurately observes, however, "the record is devoid of any evidence that Champney's will was overborne, that Shinskie was acting aggressively or relentlessly in order to secure a *Miranda* waiver, or, that Champney was threatened in any fashion." Cmwlth.'s Reply Br. at 7-8. We agree with the Commonwealth that this alternative argument for affirmance is without merit.

In sum, we conclude that while Champney invoked his right to counsel on December 23, 1997, there was a sufficient break in custody between then and May 13, 1998 that Champney's May 13, 1998 statements are not subject to the *Edwards* presumption, and his *Miranda* waiver was valid. Therefore, the trial court erred as a matter of law in suppressing Champney's May 13, 1998 statements.

Order reversed. Case remanded. Jurisdiction relinquished.

Judgment Entered.

_____

Joseph D. Seletyn, Esq.
Prothonotary

Date: <u>4/26/2017</u>

---

*(Footnote Continued)*

support of this argument nor evidence of record that his waiver was in fact so limited. We note that the standard waiver form signed by Champney and Sgt. Shinskie referenced no particular offense. Moreover, given that Sgt. Shinskie had questioned Champney about the Bensinger homicide during each of their two previous interactions, Champney could hardly have been surprised that he would raise the same subject on the third occasion.